**Fred Andrew JOHNSON, Appellant,**

v.

**Lou V. BREWER, Warden, Fort Madison Penitentiary, Appellee.**

**No. 74–1944.**

United States Court of Appeals, Eighth Circuit.

Submitted March 12, 1975.

Decided Aug. 8, 1975.

Rehearing and Rehearing En Banc Denied Sept. 24, 1975.

C. A. Frerichs, Waterloo, Iowa, for appellant.

Tom McGrane, Asst. U. S. Atty., Des Moines, Iowa, for appellee.

Before VAN OOSTERHOUT, Senior Circuit Judge, ROSS, Circuit Judge, and TALBOT SMITH,* Senior District Judge.

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. Iowa Code Ann. § 204.401(1)(a) (Supp.1971).

TALBOT SMITH, Senior District Judge.

The petitioner before us was convicted in the Iowa District Court for Black Hawk County of possession of heroin with intent to deliver.[1] His conviction was affirmed by the Supreme Court of Iowa.[2] Petitioner (hereafter defendant) subsequently brought a petition for writ of *habeas corpus*,[3] denied by the District Court, Northern Division of Iowa, from which denial appeal is taken to this court.

The sole witness to the alleged crime was one Roosevelt Nabors, a/k/a Alvin Banks. Nabors testified that he arranged for, and then witnessed, a sale between defendant and one Glenn "Bubba" Phillips.

Nabors, the record discloses, was a professional informant. He has, he testified, "worked throughout the State of Michigan," in Canada, in New York, and in Ohio. He met with police officers and narcotics agents in Chicago in answer to "a flier out from the State of Iowa, requesting an undercover, and we was answering the flier." After a conference concerning working in Iowa he proceeded, with agents and his "girl friend" to Waterloo, Iowa. There he was shown pictures of suspects and it was suggested to him that defendant might be one of them. His assigned duties were to become known in black and white neighborhoods, "develop information and, if possible, make purchases, make buys of hard drugs, which is known as heroin."

His compensation did not depend upon the cases he "made" but covered his living expenses, "food, rent, [and] so forth," including those of his female companion, the total amounting to some twelve hundred dollars in this case, plus "help" on occasion with the expenses of a car he had obtained. What his local employment arrangements were, besides his un-

2. *State v. Johnson,* 219 N.W.2d 690 (Iowa 1974).

3. 28 U.S.C. § 2254 (1966).

dercover work, are not clear from the record, since objection to a question as to the details of Agent (not to be confused with defendant) Johnson's conceded "dealings" with the informant's employer was sustained. In addition the informant had opportunity, of which he availed himself, of making a little money on the side. Thus he received $200, unreported to his superiors, for introducing "people [who] wanted to buy some heroin" to "a guy that was in this line of business."

The principal issue before us concerns his attempted impeachment. He testified that immediately prior to his coming to Iowa he had worked in Muskegon, Michigan, and that his *modus operandi,* save as to the quantity of heroin bought, there was basically as in Iowa. In Muskegon, he testified, he had made a "buy" from one Matt Durda, Jr., and had so informed the authorities. After more foundational questions defendant then made an offer of proof, set forth *in extenso* in the margin hereof.[4] What he

4. THE COURT: All right. But I guess then the record has been made that you wanted to make. And you would consider this as foundation for your right to call Mr. Zeckzer. And I think the import of all of this is that Mr. Zeckzer lives in Michigan; that the Court has indicated that he would not permit Mr. Zeckzer to testify because of the ruling he's made. I think it would be appropriate at this time that you indicate that if you were permitted to call Mr. Zeckzer what his testimony would be, in order that you have completed an offer of proof regarding that.

\* \* \* \* \* \*

MR. FRERICHS: Your Honor, at this time I would recite to the Court a statement made by the Muskegon County Attorney for the District Court, Southern Division, his recitation of the facts in connection with Mr. Durda and what Mr. Zeckzer could testify to as by way of an offer of proof.

THE COURT: Well, but what you're really saying is that if Mr. Zeckzer were called as a witness in this case, you believe his testimony would be substantially as follows.

MR. FRERICHS: Substantially as set out by the prosecution attorney there.

THE COURT: All right.

MR. FRERICHS: Okay. We have the case of Matt Durda. The case has not come to the preliminary examination stage. It is scheduled to be June 22. In this case—I will read from it—"In this case the police—" page 5 of my statement—"the police claim they had searched Mr. Nabors for a controlled buy, drove him out to Durda's Auto Parts to make a buy from Matt Durda, Jr. Durda's Auto Parts establishment—

THE COURT: Well, now, just a moment, I think the only thing you really ought to—

MR. FRERICHS: Mr. Zeckzer will testify to all this along with the police officers.

THE COURT: How can he? That isn't what Mr. Zeckzer knows anything about.

MR. FRERICHS: Well, Your Honor, I would say that I would call the police officers additionally and they would set forth their testimony as set out here.

THE COURT: You may proceed.

MR. FRERICHS: "Durda's Auto Parts establishment, like any junk dealer type of place, affords him opportunity to hide narcotics. The police report indicated that they saw Matt Durda come out the front door, go around the building with Mr. Nabors, and that Mr. Nabors came back with one tinfoil of narcotics and no money. Since the issuance of the warrant and the arrest of Matt Durda we have checked with the policeman and he admits that the man he saw come out was not Matt Durda. I believe Matt Durda is here. Furthermore, the report indicated that two other officers were inside the premises keeping a surveillance. While inside the premises the two officers say they saw Mr. Nabors come up and talk to a party inside the place who they thought was Matt Durda. Since the arrest of Mr. Durda, they have seen Mr. Durda. They admit that this was not Mr. Durda. That is, the two officers at the place. After the arrest of Mr. Durda, Mr. Durda was arrested, he was taken to the county jail and he was confronted with Mr. Nabors. And Mr. Nabors identified him as the man he purchased from. But the police did find out—now, there were two officers who were in the place, and they identified the man they saw Mr. Nabors talk to inside the place as being a person named Darrel Zeckzer, whom in this surveillance it is confirmed that Mr. Zeckzer and Mr. Nabors were running around together. Mr. Darrel Zeckzer has since been questioned. He admits he was inside the premises at that time. Mr. Nabors did come up to him and talk to him and ask for a cigarette. The police officers did see Mr. Nabors come up to Mr. Zeckzer and ask for a cigarette and he got a cigarette. But what Mr. Zeckzer states is that Mr. Nabors asked him how much should he pay for the portion of narcotics. Mr. Nabors said he was going to pay

offered to prove in substance was that the Muskegon case was a "frame-up"[5] by this informant-witness and that the Muskegon County Attorney had accordingly moved the court for dismissal of the charges.[6] The offer of proof was rejected by the trial court on the ground that it was immaterial, and a collateral matter, concerning which extrinsic testimony was not admissible. The defendant argues that, under these unique facts, the foreclosure of his defense as to the alleged mendacity of the informant went far beyond mere "error" as to the introduction of evidence but was so gross and decisive as to amount to a deprivation of due process.

We here consider, then, the unique problems presented by the testimony of the paid informer. His employment has been the subject of extensive commentary, little or none of it approbative.[7]

That his motivation may well be to make good in his employment by producing violators is commonly known. As we stated in *United States v. Barnes,* 486 F.2d 776, 780 (8th Cir. 1973):[8]

The practice of the Government in employing agent-informers in narcotics cases is well known. We also know that such agents are usually not trained officers—often they are themselves addicts or former addicts. The Government must know that an eager informer is exposed to temptations to produce as many accuseds as possible at the risk of trapping not merely an unwary criminal but sometimes an unwary innocent as well. One could hardly expect such informants always to stay on the proper side of the line which separates those two cases. And since the Government chooses to utilize such agents, with the attendant risk of entrapment, it is fair to require the Government which uses this inherently dangerous procedure to take appropriate precautions to insure that no

---

a hundred and ten dollars, which was the sum of money given to him to make the purchase by the police. Mr. Zeckzer further goes on to say that Mr. Nabors gave him one hundred and ten dollars and told him to go back to where Mr. Nabors lived and give the money to his girl friend. We know that Mr. Nabors, while he was here, had a girl friend. Mr. Zeckzer is prepared to testify to this. And he appears to be reliable. His reliability is vouched for, and I should not mention this here, as I asked the press not to say, because he admits having used heroin." Further, the testimony, I mean the statement by the prosecuting attorney indicates that Mr. Zeckzer states that they went to Detroit with Mr. Nabors and while there Mr. Nabors purchased narcotics. And we would submit, Your Honor, if Mr. Zeckzer were called from the State of Michigan, and the three police officers who were doing their surveillance at this particular time, they would substantially set forth the facts as recited to by the Muskegon County Prosecutor in his statement to the Court on June 1, 1972.

THE COURT: Would you get the jury back, please.

MR. FRERICHS: That I assume is accepted as an offer of proof, Your Honor?

THE COURT: If that's the way it was made, that's the way the record so shows.

MR. FRERICHS: Okay. Well, without the necessity of calling these witnesses down?

THE COURT: Yes.

**5.** This expression frame, or frame-up is used constantly in the record. It seems to signify, in this case, a contrived set of circumstances designed to convey a false meaning.

**6.** We find nothing in the record to indicate whether or not the case was dismissed although so asserted upon oral argument and in defendant's reply brief, but we do not regard dismissal as critical to our decision.

**7.** *See* Dix, *Undercover Investigations and Police Rulemaking,* 53 Texas L.Rev. 203 (1975); Rotenberg, *The Police Detection Practice of Encouragement,* 49 Va.L.Rev. 871 (1963) and authorities therein cited; Rotenberg, *The Police Detection Practice of Encouragement: Lewis v. United States and Beyond,* 4 Houston L.Rev. 609 (1967); *Elevation of Entrapment To A Constitutional Defense,* 7 U. of Mich. J. of Law Reform 361 (1974) particularly as to bibliography; *The Applicability Of The "New" Fourth Amendment To Investigations By Secret Agents: A Proposed Delineation Of The Emerging Fourth Amendment Right to Privacy,* 45 Wash.L.Rev. 785 (1970); Notes and Comment, *Judicial Control of Secret Agents,* 76 Yale L.J. 994 (1967).

**8.** Quoting *Velarde-Villarreal v. United States,* 354 F.2d 9, 13 (9th Cir. 1965).

innocent man should be punished. [Footnote omitted.]

These motivations have their origins in the considerations which impel a man who is essentially "anti-social, or at best anti-police [9] to give the authorities his cooperation. Such have been described by agents experienced in this field, as, among others,

> *The fear motive.* * * * [W]e might expect an emotional reaction favorable to our investigative objective, if we have a prospective informer who is afraid of something. This could be fear of any one of many things, or several of them. Our informer might be in fear of the law. This, again, might represent one of many possible conditions. Let us say that he is under arrest, possibly under indictment and facing charges. It is one of the practical facts of law enforcement that under such conditions the accused, looking for sympathy, extenuation, mitigation, or whatever he thinks might improve his lot, is often disposed to give a full account or at least some account of his crimes or those committed by others within his knowledge. He thereby may furnish us with direct evidence against other criminals or show us how such evidence might be obtained. Where such disclosures involve higher-ups or implicate numerous other defendants, this sort of development is very much to the advantage of law enforcement and organized society. It is almost the universal practice of the police, prosecutors and courts to recognize the valuable assistance to law enforcement in this attitude of the informer. This recognition is usually translated in a practical manner as a recommendation for a lesser sentence, a more favorable

consideration for parole or probation, the acceptance of a plea to a lesser account in the indictment or through some other favorable action within the discretion of the prosecution.[10]

That such motivations tend to probity and credibility rather than "to produce as many accuseds as possible" is a highly debatable conclusion. Particularly is this true in view of the circumstances, again relying upon Harney and Cross, as well as our own judicial experience, that "Many of them [informers] are unsavory characters. Some might even be termed despicable * * *.[11] Judge Waterman, concurring in part and dissenting in part in *United States v. Cimino,* 321 F.2d 509, 514 (2nd Cir. 1963), *cert. denied,* 375 U.S. 967, 84 S.Ct. 486, 11 L.Ed.2d 416 (1964), recognized this problem in a perceptive comment to the effect that:

> Seldom can government informers be expected to be pillars of stability in their communities. If the common understanding is to be credited they are often narcotic addicts or petty criminals whose cooperation with law enforcement officials is not entirely voluntary.

If, then, as we so often hear in argument, and as is argued in this case, "unsavory characters" are hired because of sheer necessity, the corollary is clear: that as the *mala fides* of the government's agent increase, the care with which he is used, his surveillance by responsible personnel, and his corroboration, become increasingly necessary, lest he pay his way with the coin of conviction by whatever means obtained.

The offer here made was thus to show that the informant before the court and jury was completely insensitive to the obligations of his oath and that from

---

**9.** Harney and Cross, *infra,* at 32 [note 10 herein].

**10.** M. Harney & J. Cross, The Informer in Law Enforcement 33 (1960) [respectively, at the time of publication, Superintendent, Division of Narcotic Control, State of Illinois; Formerly, Assistant to the Secretary for Law Enforcement, United States Treasury Department; Assistant to United States Commissioner of Nar-

cotics, and Treasury Agent and Assistant Superintendent, Division of Narcotic Control, State of Illinois; Formerly, Treasury Agent, United States Bureau of Narcotics].

Other motives impelling informer cooperation are listed as revenge, perverse, egotistical, mercenary, and desire to reform.

**11.** *Id.,* at 55.

motivations the origin of which we can only surmise, but nevertheless apparently existent, he had, as demonstrated in a parallel case, neither compunction nor scruple against "framing" a man. We have difficulty in envisioning a situation responding more completely to the orthodox test of bias, the quality of emotional partiality.[12]

The only case we have found on reasonably parallel facts, involving alleged false testimony by an undercover agent is the case of *Hutchings v. State,* 518 P.2d 767 (Alaska 1974). In this case undercover agent Clements testified that he was introduced to defendant Hutchings by another undercover agent, Hofhines, and that Hutchings sold him, Clements, the drug. Hofhines, however, at the trial, denied that Hutchings was the man she introduced to Clements. The defendant then sought to show upon cross-examination that Clements was a discharged policeman who was motivated by a desire to be reinstated to the force and was seeking to demonstrate both his effectiveness and his help to the prosecution. Objection as to immateriality was sustained. The Supreme Court of Alaska reversed on the ground that undue restriction of investigation of bias was an abuse of discretion which required retrial. The court held that Clements' hope for reinstatement to the police force could serve as a powerful motive to shade his testimony, either unconsciously or intentionally. The court went on:

> There are no special rules of "proper impeachment" for bias. The credibility of witnesses is always a material issue, so the only question of materiality or relevance when evidence is offered to impeach for bias is whether the evidence tends in reason to demonstrate the existence of some fact, state of mind or condition that a reasonable person would take into account in assessing the credibility of the witness

under attack. As we pointed out above, the balance must be weighed in favor of admissibility where impeachment for bias is the object.

518 P.2d at 769.

A recent examination by the United States Supreme Court of the permissible showing of bias is found in *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), a case involving the possible bias of a prosecuting witness deriving from his probationary status as a juvenile delinquent. The Court held that the jury may be afforded "a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony" and that:

> A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony." 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev. 1970). We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination [citation omitted].

415 U.S. at 316–317, 94 S.Ct. at 1110.

Of particular applicability to the matter before us, involving allegedly perjured testimony at a former trial, is the Court's observation to the effect that

> "[A] *partiality* of mind at some *former time* may be used as the basis of an argument to the same state at the time of testifying; though the ultimate object is to establish partiality at the time of testifying." 3A J. Wigmore, Evidence, § 940, p. 776 (Chadb-

---

**12.** 3A J. Wigmore, Evidence § 943 at 777 (Chadbourn rev. 1970). The distinguished scholar lumps into this one category the qualities of bias, corruption, and interest. Seman-

tic differences may be drawn, but for the purposes of our present analysis they are related in effect.

562

ourn rev. 1970). (Emphasis in original; footnotes omitted.)"

415 U.S. at 317 n. 5, 94 S.Ct. at 1111.

■ We recognize, of course, that the *Davis* case involved cross-examination whereas the question before us concerns impeachment of matters asserted upon cross. But so far as being "collateral," or provable by extrinsic testimony, is concerned, it is the universal holding of the authorities that as to bias the cross-examiner is not bound by the answer.[13] We are not disposed to forge a new rule upon these facts.

■ The exclusion of the testimony proffered as to the attempt by the informant-witness, the only witness to the alleged crime, to frame another defendant in a precisely parallel case went beyond a mere error [14] in the introduction of evidence. What is actually asserted is governmental conduct which, if true, is both inexplicable,[15] and violative of due process.[16]

13. "The doctrine of excluding facts offered by *extrinsic testimony* * * * has never been applied to this subject [bias]." (Emphasis in original.) 3A J. Wigmore, Evidence, § 948 at 783 (Chadbourn rev. 1970). "In courtroom parlance, facts showing bias are not 'collateral,' and the cross-examiner is not required to 'take the answer' of the witness, but may call other witnesses to prove them." [footnotes omitted.] McCormick, Evidence, § 40 at 81 (2d ed. 1972).

In addition to the textual authorities *see Smith v. United States,* 283 F.2d 16 (6th Cir. 1960), *cert. denied* 365 U.S. 847, 81 S.Ct. 808, 5 L.Ed.2d 811 (1961), extrinsic testimony permitted tending to show bias of witness allegedly having heard bomb threat made. *Cf., United States v. Oliver,* 492 F.2d 943, 948 (8th Cir. 1974), rape case, arguably "extrinsic impeachment evidence contradicting statements on collateral matters made by prosecuting witness" proper, Bright, J., concurring.

The prohibitions in the new Federal Rule of Evidence, rule 608, against showing specific instances of misconduct (other than convictions) for the purpose of attacking credibility, do not apply to evidence of bias or interest. K. Redden and S. Saltzburg, Federal Rules of Evidence Manual 175 (1975), quoting Advisory Committee's Note, Federal Rules of Evidence, rule 608 (eff. July 1, 1975), citing McCormick, § 49 and 4 Wigmore §§ 1106, 1107.

14. We recently held, *United States v. Stabler,* 490 F.2d 345, 349 (8th Cir. 1974), quoting *Kotteakos v. United States,* 328 U.S. 750, 764–765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), that:

If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand * * *. But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*See also* Saltzburg, *The Harm of Harmless Error,* 59 Va.L.Rev. 988 (1973).

15. Code of Professional Responsibility, ABA Special Committee on Evaluation of Professional Ethics, Final Draft, July 1, 1969, Canon 7—Ethical Considerations, at 83.

§ 26 The law and Disciplinary Rules prohibit the use of fraudulent, false, or perjured testimony of evidence. A lawyer who knowingly participates in introduction of such testimony or evidence is justly subject to discipline. A lawyer should, however, present any evidence his client desires to have presented unless he knows, or from facts within his knowledge should know, that such testimony or evidence is false, fraudulent, or perjured.[45] [Footnote omitted.]

45. "Under any standard of proper ethical conduct an attorney should not sit by silently and permit his client to commit what may have been perjury, and which certainly would mislead the court and the opposing party on a matter vital to the issue under consideration. . . .

"Respondent next urges that it was his duty to observe the utmost good faith toward his client, and therefore he could not divulge any confidential information. This duty to the client of course does not extend to the point of authorizing collaboration with him in the commission of fraud." *In re Carroll,* 244 S.W.2d 474, 474–75 (Ky.1951).

*See also* Code of Professional Responsibility, *supra,* Canon 7—Ethical Considerations § 13 at 79.

16. That the exclusion of critical evidence under state evidentiary rules may deprive a defendant of a fair trial and amount to a denial of due process, *see Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

The essential point is that the jury must be given an opportunity to assess the Michigan incident in whatever manner it wishes. It may, indeed, hurt the defendant, if the jury believes that the informant would be more, rather than less, careful and truthful after being compromised in Michigan. But more importantly, the truth shall never be known if one of the two knowledgeable parties to the alleged sale is immune from reasonable scrutiny of his possible relationship with the government. A jury could reasonably find *inter alia* several different forms of bias existent in this case, reasoning as follows:

a. The Michigan prosecutor would never rely on Nabors again. He needed work, which means he needed to produce for his new government employer, which may have tempted him to engage in a quick frame to demonstrate his utility.

b. In view of his Michigan experience, Nabors may have feared not only that he would no longer be used by any government as an informant, but also that he might be subject to extensive surveillance. To avoid this, he might do *anything* to remain in the good graces of some state government (a source of protection).

c. Any informant who would set-up a totally innocent man for conviction of a criminal offense may be so prejudiced against anyone *suspected* of narcotics dealings that a frame would never seem unjustified to such an informant.

d. Since Nabors indicated that he used the same *modus operandi* in Michigan as in Iowa, it may be that he has the same financial interest in a frame in Iowa as in Michigan. In other words, in Michigan he tried to divert the funds provided him for the purchase of narcotics to his girlfriend. To do this, he apparently used a frame to cover the diversion. He might have done the same thing in this case.

e. A witness who deliberately lies about commission of criminal acts against the government that pays him must assume that lies are an acceptable means to reach the ends for which he is paid, *i. e.,* convictions, and that he may believe that getting caught in a lie, not lying, was his mistake. The next time he may be harder to catch.

It must be recognized that bias, like almost every other human emotional or mental condition or attitude, is rarely provable beyond all doubt. In *Davis v. Alaska, supra,* the Supreme Court did not say the witness was biased; it said he might be. This is also the case with *Hutchings v. State, supra.* But it is equally true that it is generally impossible to be certain whether a witness is 1) truthful, and 2) if truthful, accurate. To assess truthfulness and accuracy, it is necessary at times to sift a witness' testimony by means of certain legal devices, such as impeachment.

In holding that in a case like this where a government prosecutor confesses in open court that the key prosecution witness has deliberately lied, where this same witness uses an identical *modus operandi* to become the key government witness in another case, where the informant is a career informant dependent on a continuing relationship with the government, where several different forms of bias may exist and may exist simultaneously, the State has an obligation to permit an inquiry into the initial deliberate lie, we do not fear that we strike even a modest blow against reasonable state rules of evidence.

We stress a caveat: We do not, of course, purport to pass upon the truth or falsity of those matters set forth in the offer of proof. But they are not "immaterial," they are not "collateral," and the defendant is entitled to put them before the jury. If true, the circumstances of the presentation of this witness to the

court and jury will, we are satisfied, receive searching inquiry.

The judgment of conviction is vacated. The case is reversed and remanded to the district court with directions to issue the writ of *habeas corpus* discharging petitioner, subject to the right of the State, if it wishes to do so, to try him on the indictment here involved within 90 days of the time the mandate of this court reaches the district court.

Reversed and remanded.

VAN OOSTERHOUT, Senior Circuit Judge (dissenting).

I respectfully dissent. I share the majority concern about the low type of persons used by the government as informers. However, the use of this type of witness has been repeatedly sanctioned. The credibility of any witness is to be determined by the jury, not by this court. Although the government's evidence in this case is not strong, it is sufficient if believed to support the conviction.

The critical issue on this appeal is whether the refusal of the state trial court to permit petitioner to offer the extrinsic evidence pointed out in the majority opinion relating to the witness-informer Nabors' conduct violates any constitutional right of the defendant.

[F]ederal courts possess only limited authority to consider state court evidentiary rulings in a *habeas corpus* proceeding by a state prisoner. *Cunha v. Brewer,* 511 F.2d 894, 898 (8th Cir. 1975).

See *Cage v. Auger,* 514 F.2d 1231, 1232 (8th Cir. 1975); *Donnelly v. DeChristoforo,* 416 U.S. 637, 642–643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). The scope of our inquiry is limited to an examination of whether federally guaranteed constitutional rights have been withheld. "The wisdom of evidentiary rulings will not be reviewed in *habeas corpus* unless they rise to [a] due process standard." *Cage v. Auger, supra* at 1232.

The Iowa Supreme Court affirmed Johnson's conviction. *State v. Johnson,* 219 N.W.2d 690 (Iowa 1974). In so doing the court held that under the circumstances of this case Iowa law precluded the admission of extrinsic evidence of misconduct to impeach a witness and specifically found no constitutional error.

Chief Judge McManus, before whom this *habeas corpus* case was tried, in a well-reasoned unreported opinion, likewise held no constitutional error was established and dismissed the petition. Federal Rule of Evidence 608(b), effective July 1, 1975, provides in pertinent part: "Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence." The foregoing rule re-states the pre-existing law. See *United States v. Burch,* 490 F.2d 1300, 1302 (8th Cir. 1974); *United States v. Whiting,* 311 F.2d 191, 196 (4th Cir. 1962); *United States v. Masino,* 275 F.2d 129, 133 (2d Cir. 1960).

The majority states *Hutchings v. State,* 518 P.2d 767 (Alaska 1974), is the only case found containing reasonably parallel facts and cites it as supporting a reversal. *Hutchings* is clearly distinguishable from the case before us. In that case the reversal was based on the trial court's refusal to permit cross-examination of a witness on the bias issue. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), bases a reversal on unduly restricted cross-examination of a witness which was held to violate the right to confrontation. Neither of the two cases just cited deal with the right to offer extrinsic evidence to impeach a witness.

As stated by Chief Judge McManus in his opinion, petitioner was given a wide latitude in cross-examining Nabors. No error or abuse of discretion was committed with respect to the scope of Nabors' cross-examination.

For the reasons stated in the opinion of the Iowa Supreme Court and in Chief Judge McManus' memorandum, I would hold that the petitioner has failed to

demonstrate any violation of a constitutional right and would affirm the dismissal of the *habeas corpus* petition.