Donald STEINMARK, Petitioner,

v.

Robert PARRATT, Warden, Nebraska Penal and Correctional Complex, Respondent.

No. Civ. 76–L–56.

United States District Court, D. Nebraska.

March 2, 1977.

Andrew J. McMullen, Kearney, Neb., for petitioner.

Patrick T. O'Brien, Asst. Atty. Gen. of Nebraska, Lincoln, Neb., for respondent.

## MEMORANDUM OPINION

SCHATZ, District Judge.

This is an action for writ of habeas corpus, 28 U.S.C. § 2254, brought by the petitioner, Donald Steinmark, attacking his conviction on two counts of delivery of a controlled substance in violation of Neb. Rev.Stat. § 28–4,125 (Cum.Supp.1974). Petitioner, an individual with no prior misdemeanor or felony convictions, was sentenced to and is presently serving three to nine years on each count, with the sentences to run consecutively, at the Nebraska Penal and Correctional Complex. His conviction was affirmed on appeal by the Supreme Court of Nebraska. State v. Steinmark, 195 Neb. 545, 239 N.W.2d 495 (1976). The issue raised herein concerns the credibility of the chief prosecution witness and his attempted impeachment at trial.[1] Petitioner has exhausted available state remedies. See Filing No. 11.

Petitioner (hereinafter defendant) was charged on three counts of delivering a controlled substance, to wit:

1) Delivery of amphetamines on December 12, 1974;

2) Delivery of marijuana on December 16, 1974; and

3) Delivery of marijuana on December 19, 1974.

The sole witness to the alleged deliveries was one Dennis Landrie, the self-proclaimed buyer and a professional informer. Based on his testimony, the District Court for Buffalo County, Nebraska, sitting without a jury, found the defendant guilty on the first and third counts and acquitted the defendant on the second count.

The facts are these. The defendant was employed as a night bartender at Jessie's Bar in Kearney, Nebraska. Dennis Landrie testified that he purchased the controlled substances from the defendant on the dates in question. Briefly stated, his testimony was as follows: on December 11, 1974, during the evening hours, Landrie entered Jessie's Bar and struck up a conversation with the defendant bartender. Landrie commented that he would like to purchase some "whites" (amphetamines). Shortly after closing time, a few minutes after one o'clock in the morning on December 12, 1974, the defendant took Landrie to a storage room behind the bar and sold him one hundred amphetamines. Landrie then left the bar with one Joe Stengel and made an additional purchase of two hundred amphetamines from him.

On December 16, 1974, Landrie saw the defendant bartending during the afternoon hours and inquired about purchasing some more drugs. Later that evening, after making a marijuana purchase from some other individuals, Landrie learned that the defendant was at a trailer house located on the outskirts of Kearney. Landrie drove to the trailer at approximately 9:30 p. m. He joined the defendant and Joe Stengel and one Jerry Davis inside the trailer. After a short discussion, Landrie purchased one and a half pounds of marijuana from the three and left the trailer.

On December 19, 1974, Landrie entered Jessie's Bar at approximately 8:30 p. m. The defendant was bartending and Landrie asked him for some more marijuana. Defendant made a telephone call and approximately fifteen minutes later, Jerry Davis arrived and handed a brown paper bag, containing one pound of marijuana, to the defendant who, in turn, sold it to Landrie.

No evidence was offered to corroborate Landrie's story of the alleged purchases. The only other prosecution witnesses were two law enforcement officers and two state

---

1. In addition to the briefs of the parties hereto, a brief of amicus curiae has been received from the Nebraska Civil Liberties Union pursuant to leave of court.

chemists. The law enforcement officers simply confirmed that Landrie reported to them after the purported drug purchases, recorded on tape his version of the transactions and delivered the controlled substances to them for preservation as evidence. The officers did not have Landrie under surveillance nor did they verify his purchases by other means. The two state chemists established the existence of controlled substances. Thus, the state's case against the defendant rested exclusively on the testimony of Landrie.

The defendant testified in his own defense and denied any drug transactions with Landrie. Defendant also introduced or attempted to introduce substantial evidence that he was being falsely accused and "framed" on each occasion by Landrie.

With reference to December 12, 1974, Landrie testified that he purchased one hundred amphetamines from the defendant and shortly thereafter, an additional two hundred amphetamines from Stengel. On cross-examination, Landrie denied that Stengel sold him all three hundred amphetamines. Stengel, however, testified otherwise:

Q. Do you recall where you were at on the evening of the 11th of December and the morning of the 12th of December?

MR. JEFF JACOBSON: Your Honor, at this time I would like to advise Mr. Stengel as his attorney he has a right to refuse to answer any questions under the Fifth Amendment of the United States Constitution.

[Exhibit No. 15 marked for identification]

Q. Let me ask you a couple questions, Mr. Stengel. Have you appeared in this court before? I speak particularly of March 10, 1975.

A. Yes, I have.

Q. And what was the purpose of that?

A. It was—I entered a plea of guilty on a charge.

Q. To your arraignment proceeding?

A. Right.

Q. Was there a court reporter present?

A. I believe there was.

Q. Was your testimony transcribed?

A. I believe it was.

Q. Did you submit testimony at that time to the judge?

A. Yes.

MR. HOGG: Objected to, Your Honor, incompetent, irrelevant and immaterial. May I ask a foundation question?

THE COURT: Yes, you may.

MR. HOGG: Were you placed under oath that particular morning or just before the bench?

A. No, I wasn't.

MR. HOGG: You were not under oath?

A. No, I was not.

MR. HOGG: You may continue.

THE COURT: The objection is overruled.

Q. On that date do you recall whether—

THE COURT: Mr. Hove, don't lead the witness. I'll let you proceed but don't lead the witness.

Q. What happened on that day.

A. On the 10th?

Q. Yes.

A. I don't recollect what happened on the 10th of December.

Q. Do you recall what happened at the arraignment you had on that day?

A. No, I don't.

Q. To refresh your memory, would you read through this?

A. This was for what case?

Q. Read through this. Read through the entire matter to refresh your memory. Does that refresh your memory on the time?

A. Yes, it does.

Q. Do you recall now what disposition was—what was done in court on the 10th day of March, 1975?

A. Uh-huh.

Q. What was that?

A. I was going to plead guilty to the sales of 300 amphetamines is

what the amount was I think to Dennis Landrie at Jessie's Bar. The sale wasn't made at Jessie's Bar, it was made at Sheens Trailer Court, Lot 20.

Q. Are you sure of the number of amphetamines?

A. I'm pretty sure it was 300, yes.

Bill of Exceptions, at 249–251.[2]

Stengel further testified that Landrie and defendant never went into the storage room at Jessie's Bar—the site of the alleged sale—during the time period in question.

Q. After you were at Jessie's Bar on December 12th, did you have a conversation with Dennis Landrie?

A. Yes, I did.

Q. Did you sit with Dennis Landrie?

A. We were sitting at the bar together.

Q. What time did you get to Jessie's Bar?

A. It was approximately fifteen minutes to one.

Q. What time did you leave?

A. About fifteen or twenty after 1 o'clock.

Q. Did you sit with Dennis Landrie the entire period you were there?

A. Yes, I did.

Q. Did Mr. Landrie during that period of time you were there ever get up from the bar?

A. No, he did not.

Q. Was Mr. Steinmark there that evening?

A. He was cleaning up tables and stocking the cooler with beer, just going about his every day duties.

Q. Do you know where the store room is at Jessie's Bar?

A. Yes.

Q. Did Mr. Landrie and Mr. Steinmark ever go into the store room of Jessie's Bar while you were there that evening?

A. No.

Q. What was that answer?

A. No, they did not.

Bill of Exceptions, at 256.

With reference to December 16, 1974, one witness, Larry S. Peterson, admitted selling some marijuana to Landrie during the early evening hours. Contrary to Landrie's assertion that the defendant was working at Jessie's Bar in the afternoon, two other witnesses testified that the defendant was playing poker with them at a different location. Finally, seven other witnesses directly contradicted Landrie's statement concerning the whereabouts of the defendant at the time of the alleged transaction. These witnesses testified that the defendant was bartending at Jessie's Bar throughout the entire evening. As noted above, the trial court found the defendant not guilty on this, the second, count. This verdict alone raises a most serious doubt as to Landrie's credibility and veracity on the other two counts.[3]

With reference to December 19, 1974, Tim Flessner, a college student and part-time bartender at Jessie's Bar, testified that Landrie was not in the bar on this particular evening and that although he did not know Jerry Davis, he did not see anyone hand a sack to the defendant.

Q. Going back to the 19th day of December, 1974, would you have been working on that evening?

A. If it was a Thursday I was working. It's a Thursday and I was working.

Q. What hours would you have worked on that day?

A. I worked from five until 1 o'clock.

---

2. The transcript of Stengel's arraignment held on March 10, 1975, (Exhibit No. 15) reveals that his plea of guilty to the crime charged was not accepted by the Court because of the circumstances surrounding the sale.

3. To say that this acquittal on the second count simply means that the trial court found the prosecution had not carried its burden of proof, and to therefore conclude that Landrie did not lie under oath, is to necessarily disregard and give no weight to the testimony of nine disinterested witnesses.

Q. Who did you work with?

A. I worked with Don Steinmark during the month of December.

Q. Do you remember seeing Jerry Davis on that night?

A. No, I do not.

Q. Do you know who Jerry Davis is?

A. No, I don't

Q. Do you remember seeing a Dennis Landrie on that night?

A. I do not recall ever seeing Dennis Landrie in there when I was working at night. I did see him in the afternoon one time when I went in to play pool.

Q. Did you see anybody bring a sack into Mr. Steinmark about 8 o'clock on that evening?

A. Not on that evening, no. The only sack I ever seen brought into Jessie's Bar was by a man that brings tacos in on Monday nights.

Q. Did you see him deliver a sack of anything to anybody on that evening?

A. No, I did not.

Q. When you work what part of the bar do you work in?

A. Well, I worked behind the bar as well as if it wasn't too busy I would go out to the tables and take orders also.

Q. You kind of keep an eye on the customers, do you not?

A. Yes, as best I can.

Bill of Exceptions, at 218–19.

This testimony, of course, is directly contrary to Landrie's account that he was sitting at the bar during the evening hours and that Jerry Davis delivered a brown paper bag to the defendant.

The record discloses that Landrie was a three-time convicted felon. He had worked as an informer in numerous Nebraska communities: "Fremont, Columbus, Omaha, Hastings, Grand Island, York, South Souix (sic) City, Dakota City and perhaps a few others." Bill of Exceptions, at 5. In Kearney he was employed by a drug investigator of the Nebraska State Patrol to gather information against defendants and to make undercover purchases of controlled substances. His employment began on December 7, 1974, at a rate of $75 per week, plus expense money for such items as a motel room, "purchasing beer" and "playing pool." Parenthetically, it is interesting to note that this expense money was paid to Landrie simply upon his oral request. Two or three weeks later, after numerous drug purchases, his pay rate was increased to $100 per week. The drug enforcement officer denied that Landrie's compensation was dependent upon the number of his drug buys. On cross-examination, however, the officer conceded that Landrie's "success rate" in Kearney was a reason for rapid pay increase.

Q. What was the reason it went up to $100?

A. He showed me that he could produce and he wasn't burned in this town to where he couldn't buy drugs.

Q. Did his success rate have something to do with what he was being paid then?

A. In a way; yes, Sir.

Bill of Exceptions, at 74.

Landrie's employment at Kearney was terminated during the second week of January, 1975, at which time he was receiving $125 per week and expenses.[4]

4. The Supreme Court of Nebraska determined that Landrie was an ordinary disinterested witness. *State v. Steinmark, supra,* 195 Neb. at 546. 239 N.W.2d at 496. The federal courts have long recognized that one who provides evidence against a defendant for pay or some other personal advantage is an informer and his testimony must be examined and weighed with greater care than the testimony of an ordinary witness. *See* 1 E. Devitt and C.

Blackmar, *Federal Jury Practice and Instructions* § 12.02 (2d Ed. 1970) and cases cited therein. This principle has also been applied in Nebraska. *Sandage v. State,* 61 Neb. 240, 85 N.W. 35 (1901); Nebraska Jury Instruction 14.-59 and cases cited therein. In *State v. Gurule,* 194 Neb. 618, 234 N.W.2d 603 (1975), however, the Supreme Court of Nebraska held that an informer, employed under identical circumstances as in the instant case, had no greater

■ Although a careful review of the record as a whole in the instant case clearly demonstrates that the evidence of the alleged offenses is extremely weak, and marginal at best, this Court need not decide whether the charges against the defendant were so totally devoid of credible evidence as to render his convictions unconstitutional under the due process clause of the Fourteenth Amendment. *See Thompson v. City. of Louisville*, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960); *White v. Wyrick*, 530 F.2d 818 (8th Cir. 1976); *Garza v. Wolff*, 528 F.2d 208, 210 (8th Cir. 1975); *Cunha v. Brewer*, 511 F.2d 894, 898 (8th Cir. 1975). The defendant offered to prove, both on cross-examination and through extrinsic testimony, that Landrie had testified falsely in a prior court appearance and that his reputation for truth and veracity was very poor. These offers were rejected by the trial court. On cross-examination, counsel for defendant asked Landrie if he had testified in another case to a January 7, 1975, purchase of illicit drugs from one Lindsay French. The trial court sustained an objection by the prosecutor and precluded further inquiry into this transaction. Defendant later offered the testimony of five witnesses, including French, to the effect that the January 7, 1975, purchase could not have happened at the time and in the manner described by Landrie. Defendant was attempting to prove in substance that the case against French was a complete fabrication and "frame" by this same informant. The testimony was rejected, and improperly so, on the ground that it was immaterial to the charges against the defendant.

■ "The established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-ex-

amination * * *." *Hoffa v. United States*, 385 U.S. 293, 311, 87 S.Ct. 408, 418, 17 L.Ed.2d 374 (1966). This is particularly true with respect to informers.

The use of informers, accessories, accomplices, false friends, or any of the other betrayals which are "dirty business" may raise serious questions of credibility. To the extent that they do, a defendant is entitled to broad latitude to probe credibility by cross-examination and to have the issues submitted to the jury with careful instructions.

*On Lee v. United States*, 343 U.S. 747, 757, 72 S.Ct. 967, 973, 96 L.Ed. 1270 (1952).

In *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974), a case involving the possible bias of a prosecuting witness deriving from his probationary status as a juvenile delinquent, the Supreme Court reiterated the importance and permissible scope of cross-examination.

Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of the trial judge to preclude repetitive and undue harassment and interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i. e.*, discredit, the witness. * * * A * * * particular attack on the witness' credibility is effected by means of cross-examination directed towards revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. *The partiality of a witness is subject to explo-*

---

personal interest in supplying evidence against a defendant than any other public officer and that no cautionary instruction should be given as to the weight and credibility of an informer's testimony. As noted by Justice McGown in his dissenting opinion:

The essence of [the] holding was that such testimony was to be treated the same as that of regular public law enforcement officers. Under that holding, the employment of an habitual criminal as an undercover agent

makes him an instant public law enforcement officer and clothes his testimony with the same aura of reliability as that of a uniformed police officer.

*State v. Steinmark, supra*, 195 Neb. at 551, 239 N.W.2d at 498 (Dissenting opinion).

While the majority view of an informer's testimony is not *per se* unconstitutional, the evaluation of Landrie's testimony by the state courts is relevant for the reasons discussed *infra*.

ration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony." 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev. 1970). We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. (Citation omitted.) (Emphasis added.)

415 U.S. at 316–17, 94 S.Ct. at 1110. Quoting *Greene v. McElroy*, 360 U.S. 474, 496, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), the Court added:

Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on the fact finding, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurors or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. * *

415 U.S. at 317 n.4, 94 S.Ct. at 1110.

In the instant case, defense counsel sought to cross-examine Landrie concerning his false testimony in a similar case, which in turn could have substantially discredited his testimony against the defendant. Such cross-examination was necessary in order "to show the existence of the possible bias and prejudice * * *." 415 U.S. at 317, 94 S.Ct. at 1111.

[A] *partiality* of mind at some *former time* may be used as the basis of an argument to the same state at the time

of testifying; though the ultimate object is to establish partiality at the time of testifying. 3A J. Wigmore, Evidence § 940, p. 776 (Chadbourn rev. 1970). (Emphasis in original) (Footnotes omitted.)

415 U.S. at 317 n.5, 94 S.Ct. at 1111. By precluding this line of inquiry, the trial court denied the defendant's right of *effective* cross-examination which "would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it." 415 U.S. at 318, 94 S.Ct. at 1111 (Citations omitted.)

█ The trial court also excluded the testimony of five witnesses on this same subject; namely, that the January 7, 1975, purchase from French had never taken place and was a frame by Landrie.[5] A similar factual situation was presented in *Johnson v. Brewer*, 521 F.2d 556 (8th Cir. 1975). This Court is of the opinion that the teaching in *Johnson* is controlling here and is dispositive of the instant case. In *Johnson* the facts were these. An informer testified that he had just completed working as an undercover agent in Muskegon, Michigan. After questioning the informer regarding a certain drug buy he made in Muskegon, defendant then sought to show by extrinsic testimony "that the Muskegon case was a 'frame-up' by this informant-witness and that the Muskegon County Attorney had accordingly moved the court for dismissal of charges." 521 F.2d at 559. The testimony was rejected by the trial court as immaterial and as extrinsic evidence on a collateral matter. The defendant argued that, under these unique facts, the foreclosure of his defense as to the alleged mendacity of the informant went far beyond mere "error" as to the introduction of evidence but was so gross and decisive as to amount to a deprivation of due process. In a subsequent habeas corpus proceeding, the Court of Appeals for the Eighth Circuit vacated the judgment of

---

**5.** Although the record does not reflect the disposition of the case against French, the Court notes that a jury found him innocent of this particular offense but found him guilty of another offense involving the sale of drugs to Landrie. *State v. French*, 195 Neb. 88, 236 N.W.2d 832 (1975).

conviction. The court discussed at length the motivations and credibility of a professional informer. The court noted in part:

The practice of the Government in employing agent-informers in narcotics cases is well known. We also know that such agents are usually not trained officers—often they are themselves addicts or former addicts. The Government must know that an eager informer is exposed to temptations to produce as many accuseds as possible at the risk of trapping not merely an unwary criminal but sometimes an unwary innocent as well. One could hardly expect such informants always to stay on the proper side of the line which separates those two cases. And since the Government chooses to utilize such agents, with the attendant risk of entrapment, it is fair to require the Government which uses this inherently dangerous procedure to take appropriate precautions to insure that no innocent man should be punished. (Footnotes omitted.)

521 F.2d at 559–60, *quoting United States v. Barnes*, 486 F.2d 776, 780 (8th Cir. 1973).

The court further commented on the importance of the proposed testimony.

The offer here made was thus to show that the informant before the court and jury was completely insensitive to the obligation of his oath and that from motivations the origin of which we can only surmise, but nevertheless apparently existent, he had, as demonstrated in a parallel case, neither compunction nor scruple against "framing" a man. We have difficulty in envisioning a situation responding more completely to the orthodox test of bias, the quality of emotional partiality. (Footnote omitted.)

521 F.2d at 560–61.

The court then held:

[I]t is the universal holding of the authorities that as to bias the cross-examiner is not bound by the answer. * * *

The exclusion of the testimony proffered as to the attempt by the informant-witness, the only witness to the alleged crime, to frame another defendant in a precisely parallel case went beyond a mere error in the introduction of evidence. What is actually asserted is governmental conduct which, if true, is both inexplicable and violative of due process. (Footnotes omitted.)

521 F.2d 562.

Here the defendant offered to prove that Landrie, a career informer and key state's witness, deliberately lied under oath in another case during his tenure as an undercover agent in the Kearney area. Precisely as in *Johnson*, the state had an obligation to permit full inquiry into this subject matter.

Finally, the trial court refused to allow a defense witness, Francis R. Pane, Assistant Douglas County Attorney, to testify concerning Landrie's reputation for truth and veracity in Omaha, one of his prior residences.

Q. When was the first occasion you had to meet Landrie?

A. The first time I saw Mr. Landrie was December 9, 1969.

Q. How many times thereafter did you see him?

Mr. HOGG: Objection, Your Honor, incompetent, irrelevant and immaterial, unless Mr. McMullen is going to elicit testimony concerning Mr. Landrie's reputation for truth and veracity on the point in question, specifically, the purchases allegedly made from Mr. Steinmark; and for the further reason that if we are going to delve into the witness', Mr. Dennis Landrie's criminal background, unless Mr. McMullen can show that Mr. Landrie has more than three felony convictions which he admitted to on his record, the defense cannot delve further into this particular matter on this point.

THE COURT: The objection is sustained.

Q. You were acquainted with him at that time?

A. Yes, in the course of my employment.

Q. In the course of your employment you have additionally kept track or know of his whereabouts on some occasions since that time?

MR. HOGG: Objected to for the same reasons set out in the previous objections, Your Honor.

THE COURT: Overruled; he may answer.

A. I have found out since, yes.

Q. From your knowledge of this individual with respect to his veracity, would you believe him under oath?

Mr. HOGG: Objected to, Your Honor, unless counsel—

THE COURT: The objection is sustained.

Q. Do you have an opinion with respect to this man's—Do you know of this man's reputation for truth and veracity?

MR. HOGG: Objected to, Your Honor, unless it can be pointed out or narrowed down to the particular point that it is admissible through the alleged buys concerning Mr. Steinmark.

THE COURT: The objection is sustained.

Q. Are you acquainted with this individual's reputation for truth and veracity in the area of Omaha, Nebraska?

MR. HOGG: Objected to, Your Honor, being incompetent, irrelevant and immaterial, not timely and also because it does not go to the point in question here before the bar today.

THE COURT: I'll permit him to answer yes or no.

A. I would have to qualify that as to time, yes.

Q. What is that opinion?

MR. HOGG: Objected to—

THE COURT: The objection is sustained.

MR. McMULLEN: May I make an offer to prove at this time?

THE COURT: Yes.

MR. McMULLEN: If you were allowed to answer it, do you have an opinion as to his reputation for truth and veracity in the Omaha, Nebraska, area, your answer is a qualified yes.

A. Yes.

MR. McMULLEN: What would that opinion be?

A. My opinion would be that I wouldn't believe what he would have to say as to the time I knew him.

MR. McMULLEN: Thank you.

MR. HOGG: Which offer of proof is objected to for the reason it's incompetent, irrelevant and immaterial, insufficient and improper foundation, untimely, and for the further reason it goes to the reputation of the particular person in other than cases before the bar today and Mr. Landrie's actions concerning the case before the bar today in Buffalo County, Nebraska, specifically, Kearney, Nebraska.

THE COURT: The objection to the offer of proof is sustained. You may be excused.

Bill of Exceptions, at 248–49.

The courts have long recognized that testimony regarding the reputation for truth and veracity in a community of a witness is relevant and, therefore, admissible. *Osborne v. United States*, 542 F.2d 1015 (8th Cir. 1976). *See also* Fed.R.Evid. 608; Neb. Rev.Stat. § 27–608 (Reissue 1975); McCormick, *Evidence* § 44 (2d Ed. 1972). The trial court erred in excluding the proffered testimony and the error was highly prejudicial. Landrie was the only witness to the offenses charged. The credibility which the court attached to his testimony must inevitably have determined the guilt or innocence of the defendant. To be sure, the credibility of this key witness was open to serious question. The exclusion of the proffered testimony can be only regarded as material and significant.

In this court, the respondent, State of Nebraska, has not sought to defend or justify the rulings of the trial court. Instead, the state argues that the rulings constitute mere evidentiary error in a trial

to the court. It is well settled, of course, that federal courts will not and should not ordinarily review the wisdom of evidentiary rulings in a habeas corpus proceeding. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Schleicher v. Wyrick*, 529 F.2d 906 (8th Cir. 1976); *Cage v. Auger*, 514 F.2d 1231 (8th Cir. 1975); *Cunha v. Brewer, supra,* 511 F.2d 894. This court adheres in all respects to this caveat. But where trial errors infringe upon basic constitutional protections or are so prejudicial as to violate due process, then a federal claim is stated and an appropriate remedy is permissible, and indeed, required. *See Agee v. Wyrick*, 546 F.2d 1324 (8th Cir. 1976).

In the instant case, the exclusion of critical evidence, coupled with the trial court's refusal to permit defense counsel to fully and effectively cross-examine Landrie, went far beyond mere error. The cumulative impact of the rulings denied the defendant "a trial in accord with traditional and fundamental standards of due process." *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). The truthfulness of Landrie's testimony was the key element in the case against the defendant. In effect, the evidence rulings frustrated defendant's efforts to develop his theory of defense. The claim of bias and prejudice which the defense sought to develop was far less persuasive than it might have been had defense counsel been given an opportunity to fully cross-examine Landrie and had the extrinsic testimony been admitted and considered by the trial court. The fact that the defendant's case was tried to the court does not alter the result. The principles discussed herein are equally applicable to cases tried to the court since the judge is substituted for the jury in all respects. This necessarily includes the role of determining the weight and credibility to be given to the testimony of witnesses. In the instant case, the trial judge should have considered the proffered evidence so that he could make an informed judgment as to the weight to place on Landrie's testimony which provided the crucial link in the case against the defendant.

This Court does not, of course, speculate as to the truth or falsity of those matters set forth in the offers of proof. But they are not immaterial; they are not collateral; and the defendant is entitled to have them fully considered by the trial court whether sitting with or without a jury. In so holding, this court, as in *Johnson,* has no fear and no intention that it strikes even a modest blow against reasonable state rules of evidence. 521 F.2d at 563.

Accordingly, a separate order will be entered this day granting a writ of habeas corpus discharging petitioner, subject to the right of the state, if it wishes to do so, to retry him on the charges involved herein within ninety (90) days.