**Frank E. SHERER, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 81–735.**

District of Columbia Court of Appeals.

Argued Feb. 22, 1983.

Decided Sept. 30, 1983.

Holly R. Skolnick, Public Defender Service, with whom A. Franklin Burgess, Public Defender Service, Washington, D.C., at time briefs were filed, was on briefs, for appellant.

·R. Christopher Locke, Atty. Dept. of Justice, Annandale, Va., with whom Stanley S. Harris, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on brief, for appellee.

Before NEWMAN, Chief Judge, FERREN, Associate Judge, and KELLY, Associate Judge, Retired.*

FERREN, Associate Judge:

A jury convicted appellant of first-degree murder while armed (felony murder), D.C. Code §§ 22–2401, 22–3202 (1981), attempted robbery while armed, id. §§ 22–2902, 22–3202, second-degree burglary while armed, id. §§ 22–1801(b), 22–3202, and carrying a pistol without a license, id. § 22–3204.[1] On appeal he argues that: (1) the trial court impermissibly restricted his cross-examination of Donald Garrison, a self-confessed accomplice and star government witness; (2) the trial court erred in allowing the government to introduce prior consistent statements of Harrison Clark, a second accomplice/witness; (3) the trial court erred in refusing to give a requested perju-

---

* Judge Kelly was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on March 31, 1983.

1. Appellant was sentenced to concurrent terms of 20 years' to life imprisonment for murder and 15 years' to life imprisonment for attempted robbery; a term of 8–24 years' imprisonment for burglary, to run consecutive to the attempted robbery sentence; and a term of 3–10 years' imprisonment for carrying a pistol without a license, to run consecutive to the burglary sentence.

ry instruction; and (4) prosecutorial misconduct requires reversal. We affirm.[2]

## I.

The government charged appellant in the fatal shooting of Robert Jurek on June 8, 1979, at the Regency Health Club at 4th and L Streets, N.W. The prosecution's case rested primarily on the testimony of two admitted participants in the crime, Harrison Clark and Donald Garrison.

Clark testified that he had known both appellant and Garrison for approximately seven years. The three met early in the evening of June 8 and spent the next few hours cruising back and forth between the 1200 block of New York Avenue and the Maryland/District line. They stopped several times to buy liquor, which they consumed steadily throughout the evening. At approximately 11:30 p.m., they parked in a lot opposite the Regency Health Club. Garrison and appellant got out of the car and disappeared into the club. Clark heard a bang "like a gun fired." Some time later, the two returned to the car; appellant was wearing a woman's stocking over his face. Clark heard them exchange words about shooting a man. He let appellant off at a nearby bar, then drove off to Virginia with Garrison.

Garrison testified that appellant suggested robbing the Regency. Appellant told him that because the club had been robbed before, its employees would offer no resistance. Garrison agreed to help rob the Regency. Once inside the club, Garrison saw two men folding blankets. Appellant told them it was a stick-up; one of them refused to turn over money and appellant shot him. Garrison ran to the car; appellant joined him a few minutes later. In response to Garrison's question in the car, appellant said that he had shot the victim because he did not like him.

Appellant presented an alibi defense. Richard Rossi, who stated that he was a friend of appellant but had been a closer friend of the victim, testified that appellant had been in the Naples bar on New York Avenue at the time of the murder. Joseph Johnson, an eyewitness to the murder, testified that although he had not seen the gunman's face, he had seen the killer's wrist as his hand reached into the club's cashbox. The skin on his wrist was dark; Johnson testified that the man was a Negro. A second eyewitness, Thomas Caniford, testified that he had seen the gunman's hands and that the stocking mask only partially covered the gunman's face, enabling Caniford to see skin on his face and neck. Caniford, too, testified that the gunman was black. Appellant is white.

## II.

Appellant filed two pretrial motions: a "motion in limine to permit cross-examination on prior misconduct and co-operation with the police and prosecutors to demonstrate the bias of Mr. Donald J. Garrison," and a "motion to compel production of Brady material and memorandum in support of cross-examination concerning relevant 'bad acts.'" In these motions, defense counsel proffered that the twenty-one year old accomplice had a long history of committing crimes and then winning lenient treatment through cooperation with police and prosecutors.

According to the proffer, in 1975 Garrison was arrested for armed robbery, but the charge was dismissed because of his cooperation with the police. In 1977 Garrison took part in the armed robbery of a Virginia bank in the course of which a state policeman was killed. Two days later he telephoned the FBI and the Arlington, Virginia police and told these authorities of his own involvement. In the words of appel-

---

**2.** We summarily reject a fifth argument: appellant urges that the trial court abused its discretion by failing to order the government to release the grand jury testimony of one of the defense witnesses so that the testimony could be used to rehabilitate the witness. Review of the record reveals that the witness was never impeached. By definition, an unimpeached witness cannot be rehabilitated.

lant's motion in limine, "[u]tilizing his status as a suspect in the bank robbery homicide, which he himself had created by his tip ..., he began to deal." According to the defense proffer, as a result of a complex plea arrangement with state and federal authorities, Garrison served a total of slightly over six months in prison for his involvement in the Virginia bank robbery/murder, an armed robbery of a Virginia supermarket, transportation of stolen vehicles in Ohio, petit larceny in Virginia, transportation of stolen property across state lines in Georgia, and a weapons offense in the District of Columbia. In addition, he entered into the Federal Witness Protection Program in July 1978 and was receiving federal funds through the program at the time he took part in the attempted robbery/slaying in the present case. As consideration for this favorable treatment, Garrison agreed to testify in the Ohio case and in the two Virginia armed robberies. In the words of appellant's motion in limine:

> In November 1979, trial began in the bank robbery/homicide case. In the middle of his testimony, Mr. Garrison fled the state, being arrested in West Virginia. Because of his flight, a mis-trial was declared. In December 1979, he testified in the Safeway armed robbery. By all accounts, his testimony was extraordinarily ineffective, apparently purposefully so. The defendant, Donald Anderson, was acquitted. In late February 1980, the Government chose not to reprosecute Mr. Anderson on the bank robbery/homi-

cide charge because it no longer believed Mr. Garrison concerning the involvement of two of the persons he claimed had committed the crime with him and Anderson. In March 1980, Mr. Garrison was sentenced to five months for criminal contempt for his flight, the judge putting aside his claim that he had fled because he had been threatened.

In his two pretrial motions, and again in the course of the trial, appellant sought permission to explore on cross-examination (1) Garrison's prior dealings with the authorities; and (2) his alleged perjury in the November 1979 Virginia trial. Appellant advanced separate theories for these proposed subjects of cross-examination. First, appellant argued that Garrison's prior course of dealing evinced a motive to curry favor with the government. Second, he argued that a prior act of false swearing is "almost analogous to another crime situation," and that it "goes to the core of credibility." We address each argument in turn.

A.

In seeking permission to explore the issue of bias, appellant likened Garrison to a paid informer who—having failed to deliver a conviction in one proceeding and fearing that his livelihood is in jeopardy—will do anything to deliver a conviction in the next proceeding. *See Johnson v. Brewer,* 521 F.2d 556 (8th Cir.1975) (trial court improperly excluded evidence that career informant had previously perjured himself to frame an innocent person); [3] *People v. Mas-*

---

3. In *Johnson,* as here, the previous alleged perjury had taken place in another jurisdiction. In Johnson's trial for possession of heroin, the trial court rejected the defendant's offer of proof on the grounds that it was "immaterial" and involved a "collateral matter," and that therefore no extrinsic evidence could be introduced on the subject. 521 F.2d at 559. *See* Fed.R.Evid. 608. The United States District Court for the Northern District of Iowa denied the defendant's petition for writ of habeas corpus. The United States Court of Appeals for the Eighth Circuit reversed, holding that the jury was entitled to consider the prior false swearing as evidence of bias:

> The essential point is that the jury must be given an opportunity to assess the Michigan incident in whatever manner it wishes. It may, indeed, hurt the defendant, if the jury believes that the informant would be more, rather than less, careful and truthful after being compromised in Michigan. But more importantly, the truth shall never be known if one of the two knowledgeable parties to the alleged sale is immune from reasonable scrutiny of his possible relationship with the government. A jury could reasonably find *inter alia* several different forms of bias existent in this case, reasoning as follows:

*carenas,* 21 Cal.App.3d 660, 98 Cal.Rptr. 728 (1971) (trial court erred in preventing defendant charged with furnishing narcotic to a minor from presenting evidence that witness had previously made false charge of selling drugs to a minor, where evidence was proffered to show witness' desire to further his career ambition to become a federal narcotics agent). In addition, counsel sought to demonstrate on cross-examination Garrison's subjective perception that his mid-trial flight in Virginia was being held over his head; *i.e.,* that he believed he "would be punished for the sins of his past 'welching' unless he gave the government exactly what he perceived it wanted this time. . . ."

The confrontation clause of the Sixth Amendment encompasses the criminal defendant's right to effective cross-examination of government witnesses. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Defense counsel must have the opportunity on cross-examination to reveal "possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." *Id.* at 316, 94 S.Ct. at 1110. Moreover:

> Although inquiry designed to elicit possible bias is a major purpose of cross-examination of any witness, the importance of such examination assumes greater significance in certain circumstances. For example, bias cross-examination directed to a key witness may be extremely important to the jury's determination of guilt or innocence, especially where one who is a key government witness is also a professional informant, or an accomplice or participant in the crime for which the defendant is being prosecuted.

*Springer v. United States,* 388 A.2d 846, 855 (D.C.1978) (citations omitted).

Appellant's proffered line of questioning would have tended to show that Garrison had a current relationship with the court system that arguably provided a basis for him to curry favor with the government. The witness had previously functioned as an informant, trading his testimony for financial gain as well as a lenient sentence. If he harbored any aspiration to reenter the Witness Protection Program or otherwise to further his career as an informant, he would have had reason to tailor his testimony to the wishes of his prospective employer.

Furthermore, counsel's proffer included at least some showing that the witness had reason to believe the proceedings in this case were connected with those in Virginia. The record contains a letter dated Septem-

> a. The Michigan prosecutor would never rely on [the informant] again. He needed work, which means he needed to produce for his new government employer, which may have tempted him to engage in a quick frame to demonstrate his utility.
>
> b. In view of his Michigan experience, [the informant] may have feared not only that he would no longer be used by any government as an informant, but also that he might be subject to extensive surveillance. To avoid this, he might do *anything* to remain in the good graces of some state government (a source of protection).
>
> c. Any informant who would set-up a totally innocent man for conviction of a criminal offense may be so prejudiced against anyone suspected of narcotics dealings that a frame would never seem unjustified to such an informant.
>
> d. Since [the informant] indicated that he used the same *modus operandi* in Michigan as in Iowa, it may be that he has the same financial interest in a frame in Iowa as in Michigan. In other words, in Michigan he tried to divert the funds provided him for the purchase of narcotics to his girlfriend. To do this, he apparently used a frame to cover the diversion. He might have done the same thing in this case.
>
> e. A witness who deliberately lies about commission of criminal acts against the government that pays him must assume that lies are an acceptable means to reach the ends for which he is paid, *i.e.,* convictions, and that he may believe that getting caught in a lie, not lying, was his mistake. The next time he may be harder to catch.
>
>    *   *   *   *   *   *
>
> . . . We do not, of course, purport to pass upon the truth or falsity of those matters set forth in the offer of proof. But they are not "immaterial," they are not "collateral," and the defendant is entitled to put them before the jury.

*Johnson, supra,* 521 F.2d at 563.

ber 18, 1979, purportedly written at the instance of Garrison's lawyer, from the Virginia Commonwealth's Attorney to the Assistant United States Attorney preparing the case against Garrison for the grand jury in the District of Columbia. The letter stated that "Mr. Garrison's cooperation [in the Virginia and federal matters] is continuing, and I am advising you of the same, so that his cooperation in these very important cases can be taken into account in your current plea negotiations with Mr. Garrison and his attorney." If this letter about his "continuing" cooperation aided Garrison in his dealings with District of Columbia officials—or if he believed it aided him—then he would have reason to believe that his mid-trial flight in Virginia could have negative repercussions in this case. This fear could, in turn, induce him to tread extra-carefully in his testimony against appellant.

Accordingly, we agree with appellant that this proposed line of questioning was both relevant and proper. *Reed v. United States,* 452 A.2d 1173, 1177 (D.C.1982); *Tabron v. United States,* 410 A.2d 209, 212 (D.C.1979) (*Tabron I); Springer, supra,* 388 A.2d at 857.

The matter does not end there, however, for the right to explore a witness' possible biases is not without limits. The trial court retains discretion to prevent repetitive, protracted, or cumulative cross-examination. *Brown v. United States,* 409 A.2d 1093, 1099 (D.C.1979).

█ The trial court allowed defense counsel to question Garrison about his plea agreement in this case. Counsel brought out the fact that Garrison had not yet been sentenced for his role in Jurek's death, that his plea agreement specifically provided he would not be sentenced until after he testified against appellant, that he knew he would be sentenced by the same judge who presided at appellant's trial, and that he

knew he was eligible for sentencing under the Federal Youth Corrections Act, 18 U.S.C. § 5005 *et seq.* (1976). More specifically, the jury learned that the trial court could either sentence Garrison under the Act, in which case he might not have to serve any time in prison and could ultimately get the conviction expunged from his record, or could sentence him to a maximum sentence of fifteen years to life in prison. In response to defense counsel's question, "You believe, don't you, that whether or not you get a favorable recommendation by the government at the time of sentencing will depend upon how your testimony goes, is that right?", Garrison said he believed that, as long as he testified truthfully, the government would not oppose his lawyer's recommendation.

The cross-examination summarized above demonstrated to the jury that Garrison had a strong incentive to slant his testimony in favor of the government.[4] Questions about Garrison's prior dealings with the Virginia authorities at most would have revealed that he had additional and less powerful reasons to perjure himself. Appellant was able to demonstrate that the witness believed the government held a sword over his head; the trial court had discretion to bar time-consuming and potentially confusing inquiry into whether he also believed it held a steak knife. *Brown, supra,* 409 A.2d at 1099. Under the circumstances here, the trial court did not abuse its discretion in denying appellant's motion to permit cross-examination on Garrison's previous cooperation with police and prosecutors in other jurisdictions.

## B.

Appellant next argues that the trial court committed reversible error by failing to allow counsel to cross-examine Garrison about his alleged perjury in the 1979 Virginia trial. To put the matter in context,

---

4. Appellant's counsel argued to the jury in closing, "Ladies and gentlemen, what do you believe is the meaning of an oath to tell the truth to Mr. Donald J. Garrison? It has no meaning, we submit.... He pled to second degree mur-

der, he knows he has got Youth Act possibility. He says he doesn't care about those. You heard the Youth Act has no minimum sentence, and it can be erased off his record. You don't believe he is a little interested in this?"

we summarize the evidentiary rules on the impeachment of witnesses with specific instances of "bad conduct."

■ The general credibility of a witness can be impeached by evidence that the witness has been convicted of a crime punishable by death or imprisonment in excess of a year, or of a crime involving dishonesty or false statement regardless of the punishment. D.C.Code § 14–305 (1981). The conviction can be established either through cross-examination or by extrinsic evidence. *Id.* § 14–305(b)(1), (c).

■ In contrast, a witness may be cross-examined on a prior bad act that has not resulted in a criminal conviction only where: "(1) the examiner has a factual predicate for such question, and (2) the bad act 'bears directly upon the veracity of the witness in respect to the issues involved the trial.' " *United States v. Akers,* 374 A.2d 874, 878 (D.C.1977) (quoting *Kitchen v. United States,* 95 U.S.App.D.C. 277, 279, 221 F.2d 832, 834 (1955), *cert. denied,* 357 U.S. 928 (1958)); *Lee v. United States,* 454 A.2d 770, 775 (D.C.1982). Moreover, where such impeachment is permitted, evidence of the prior misconduct may be elicited only by cross-examination of the witness; it may not be proved by extrinsic evidence. *Akers, supra,* 374 A.2d at 878 n. 9.[5]

■ Appellant, as we understand him, does not rely directly on these evidentiary rules. Rather, he contends that there is a right under the confrontation clause, *Davis, supra,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347, and the due process clause,

*Lewis v. United States,* 393 A.2d 109, 118–19 (D.C.1978) *(Lewis I),* aff'd on reh'g, 408 A.2d 303, 312 (D.C.1979) *(Lewis II),* to cross-examine a witness about prior acts of perjury, even if they did not lead to a conviction, on the ground that nothing is more probative of a witness' willingness to lie under oath than evidence that the witness has, under similar circumstances, lied under oath.[6]

This logic has considerable force on the facts of this case, where the witness' general credibility was impeached, for example, by his convictions for robbery and solicitation of sodomy—convictions having less bearing on truthfulness than evidence of prior perjury. However, if there is, under some circumstances, a right of constitutional dimension to question a witness about prior acts of perjury, *see* note 6 *supra*—a question we need not resolve today—that right is contingent on a showing that the perjury actually took place.

The record in this case does not provide adequate support for appellant's asserted right to cross-examine about the alleged perjury in the Virginia trial.

> Although it tips the scales in favor of permitting cross-examination the confrontation clause does not prevent the trial court from weighing the offer of proof to determine its probative value to the trier of fact and its probable effect on fair and efficient conduct of the trial.

*Chipman v. Mercer,* 628 F.2d 528, 531 (9th Cir.1980). Appellant's proffer—as the ex-

---

5. These impeachment rules should not be confused with the analytically distinct doctrine that restricts the introduction, as substantive evidence, of an accused's prior crimes or bad acts. *See Campbell v. United States,* 450 A.2d 428 (D.C.1982); *Drew v. United States,* 118 U.S.App.D.C. 11, 15–16, 331 F.2d 85, 89–90 (1964). Unlike the doctrine discussed in *Campbell*—which is intended to prevent the prosecution from introducing evidence of a defendant's unrelated past misconduct solely to suggest his guilt in the case at trial—the impeachment rules outlined in the text apply to all witnesses and serve the principal purpose of preventing the trial from "spin[ning] off into a series of sub-trials on collateral issues both

confusing and time-consuming." *United States v. Robinson,* 174 U.S.App.D.C. 224, 227, 530 F.2d 1076, 1079 (1976).

6. Under the federal rules of evidence, the trial court has discretion to allow impeachment by cross-examination—but not by extrinsic evidence—of prior bad acts that are probative of truthfulness. Fed.R.Evid. 608(b). This court has not adopted the federal rules. Appellant's position appears to be that Fed.R.Evid. 608(b) has constitutional underpinnings; *i.e.,* that if the prior bad act is perjury, the court must allow cross-examination.

cerpt quoted in the text above at p. 5 illustrates—was conclusory and based almost entirely on inadmissible hearsay, i.e., counsel's conversation with the Virginia prosecutor. Compare Mesarosh v. United States, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956) (Solicitor General informed United States Supreme Court of government's evidence that its witness had in other proceedings falsely accused others of illegal communist activity); Johnson, supra, 521 F.2d at 563 (prosecutor in previous narcotics trial admitted in open court that the key prosecution witness had deliberately lied). The government in this case contested appellant's proffer, contending that the Virginia prosecutor had other reasons for deciding to drop the case. The government also proffered that Garrison had "passed" two polygraphs on his version of the Virginia crime which, if nothing else, suggests he would have stuck by his story if he had been cross-examined on the subject.

We agree with the confrontation clause analysis of the United States Court of Appeals for the Ninth Circuit in Hughes v. Raines, 641 F.2d 790 (9th Cir.1981), a case in which a criminal defendant petitioned for a writ of habeas corpus on the ground that he should have been allowed to demonstrate that the complainant in his rape trial had previously made a false accusation of rape:

First, any conclusions drawn from this fact that would bear on this case would depend upon whether it could be shown convincingly that the other charge was false. This is very doubtful. The offer of proof indicates that cross-examination would have revealed that [the complainant] contended the prior charge was true, that the man involved denied attempting

to rape her, and that the district attorney did not prosecute the charge. The fact that the district attorney chose not to prosecute, in itself, could mean no more than that he decided he did not have sufficient evidence to obtain a conviction.

Id. at 792. The Court of Appeals found no confrontation clause violation.

Given appellant's scanty offer of proof, we find no abuse of discretion—and nothing approaching a confrontation or due process clause violation—in the trial court's refusal to allow cross-examination on the prior alleged instance of perjury.[7]

### III.

We turn to appellant's argument that the prosecutor improperly used prior consistent statements to rehabilitate Clark's testimony. The defense advanced the theory that Clark and Garrison decided to frame appellant. On cross-examination, defense counsel impeached Clark with a statement Clark had given the police, implicating appellant, at the time of Clark's arrest. Defense counsel brought out several discrepancies between the account Clark gave at trial and the account he had given the police. All discrepancies concerned details in his story, e.g., whether appellant had a dog with him on the night of the crime, where Clark went after the robbery, and how many times during the evening he went to Maryland to buy liquor.

Over defense objection, the trial court permitted the government, on redirect, to question Clark more fully about his statement to the police. The court later allowed the government to question the detective

---

7. We reject appellant's argument that he should have been allowed to impeach Garrison with a juvenile conviction for armed robbery. Tabron I, supra, 410 A.2d at 212 (impeachment with juvenile adjudications required only where useful in establishing specific bias or where such impeachment of general credibility might affect outcome); Tabron v. United States, 444 A.2d 942 at 943 (D.C.1982) (Tabron II). We also need not decide whether the court's failure to permit appellant to impeach Garrison with his criminal contempt conviction was error un-

der D.C.Code § 14–305(b)(1)(B); i.e., we need not decide whether contempt is a crime involving dishonesty or false statement. Given the extensive bias impeachment, as well as the general credibility impeachment with convictions for robbery, petit larceny, bringing stolen property across state lines, giving a false name, and solicitation of sodomy, we conclude that the error, if any, was harmless beyond a reasonable doubt. Tabron II, supra, 444 A.2d at 944.

who had taken Clark's statement about its contents, and ultimately admitted the statement itself into evidence.

■ Appellant's theory is that the government asked Clark about his statement to the detective solely for the purpose of showing the jury that Clark had told a story implicating appellant twice: once on the witness stand and once, earlier, to the police. According to appellant, therefore, the government ran afoul of the "general rule [that] prior statements consistent with a witness' trial testimony are inadmissible on the theory that 'mere repetition does not imply veracity.'" *Reed, supra,* 452 A.2d at 1180 (quoting *Warren v. United States,* 436 A.2d 821, 837 (D.C.1981)).[8]

■ This argument ignores the fact that the jury had learned from defense counsel, not from the prosecutor, that Clark had given a statement to the police implicating appellant. The rule barring the introduction of prior consistent statements is designed to prevent the jury from learning that a witness has given the same account out of court that he or she gave on the stand. The rationale for the rule is that a witness' having told the same story on more than one occasion has no bearing on the truth of the statement. The rule is not designed to bar the introduction of cumulative evidence of a statement that already is properly before the jury. Thus, appellant

could not invoke the rule to bar the jury's hearing on redirect examination of Clark, and on direct examination of the detective, that Clark had previously implicated appellant.[9]

Appellant argues, however, that the redirect examination should have been strictly limited to the discrepancies brought out on cross. We disagree. Defense counsel tried to show that the prior statement was inconsistent with Clark's in-court testimony by eliciting the discrepancies described above. The inference counsel was asking the jury to draw from the discrepancies was that his testimony was not credible. In the words of appellant's reply brief, "counsel tried to show that because Clark was making up his story about what happened that night, he could not keep the story straight and there were numerous inconsistencies."

On redirect, the government took the prior statement that defense counsel asserted was inconsistent and tried to show that it was basically consistent with Clark's trial testimony and that the testimony, therefore, could be credited. In order to do this, the prosecutor took Clark through his narrative to the police, questioning Clark about details not discussed on direct.[10]

The inference that defense counsel asked the jury to draw was tenuous at best. It may be logical to infer, when a witness on

8. The rule against admission of prior consistent statements is not absolute; it has two generally recognized exceptions: First, if a witness is impeached by a showing that the witness has reason to lie in court, then an out-of-court consistent statement can be introduced if the out-of-court statement was made at a time, or under circumstances, in which the witness had no reason to lie. *Reed, supra,* 452 A.2d at 1180 (court erred in admitting prior consistent statement that did not antedate alleged motive to lie); *Copes v. United States,* 120 U.S.App.D.C. 234, 345 F.2d 723 (1964) (court did not err in admitting prior consistent statement made at a time when, although witness had same reason to lie as she did at trial, she believed herself to be dying). Second, if "the witness' testimony has been impeached by a portion of a statement which also contains relevant information that could be used to meet the force of the impeachment," such additional relevant infor-

mation from the statement is admissible even though it constitutes a prior consistent statement. *Rease v. United States,* 403 A.2d 322, 328 n. 7 (D.C.1979) (per curiam) (citation omitted).

9. Although appellant could have objected to the detective's testimony on the ground that it was cumulative, he did not so object; and, in any event, the trial court has wide discretion in deciding whether to admit cumulative evidence. *Brown, supra,* 409 A.2d at 1099.

10. Appellant's objection to the line of redirect questioning was based solely on the ground that Clark's statement was a prior consistent statement. We stress that this is not a case in which the prosecution sought to elicit for the first time on redirect portions of a statement inadmissible on some other theory, *e.g.,* details concerning other bad acts. See Part II, *supra.*

the stand is unable to keep the details of a story straight from minute to minute, that the witness is making up the story as he or she goes along. But if the witness cannot keep certain details straight from year to year—here, certain details in Clark's statement to the police compared to details in his trial testimony—it is more natural to infer that the witness has simply forgotten the details than to infer that the witness has fabricated the basic story about one of the most significant days of his or her life. The government was entitled to press this more natural inference on the jury by trying to show that the discrepancies were trivial when measured against the message of the statement as a whole: that appellant, not someone else, accompanied Clark that night.

A recognized exception, by virtue of which the complainant's ... statement might qualify for admission, is that "if some portions of a statement made by a witness are used on cross-examination to impeach him, other portions of the statement which are relevant to the subject matter about which he was cross-examined may be introduced in evidence to meet the force of the impeachment."

\* \* \* \* \* \*

Examination by the jury, in the context of the complainant's full statement of the excerpts previously utilized on his cross-examination was calculated to assist a determination as to just how serious the inconsistencies might be. Thus we conclude that the trial judge could properly let in those portions of the statement that were relevant to any other portion made the subject of cross-examination. Relevance is a matter committed primarily to the sound judgment of the trial judge, and here we cannot say that he erred. *Coltrane v. United States,* 135 U.S.App.D.C. 295, 304, 418 F.2d 1131, 1140 (1969) (footnotes omitted); *accord Reed, supra,* 452 A.2d at 1180; *Rease, supra,* note 8, 403 A.2d at 327–28. We therefore conclude that the redirect examination of Clark was proper.

### IV.

■ During cross-examination Clark admitted that he had lied to the grand jury.[11] Defense counsel requested that the court read to the jury the standard instruction on a perjurer's testimony.[12] The court denied the request without explanation but did give the jury the standard instruction on an accomplice's testimony.[13]

Although a merged perjurer/accomplice instruction would have been appropriate, *see United States v. Leonard,* 161 U.S.App. D.C. 36, 43, 494 F.2d 955, 962 (1974), the court was not required to give "double instructions." *Id.* We find no reversible error. *United States v. Bowman,* 197 U.S. App.D.C. 246, 254, 609 F.2d 12, 20 (1979).

### V.

■ Finally, appellant argues that the prosecutor's closing argument was so laced with improper comments as to deprive appellant of a fair trial. We agree that the prosecutor exceeded the bounds of proper advocacy—as did defense counsel. We con-

---

11. Q. You went in that grand jury and denied hearing these men talk about that shot afterwards, didn't you?
(Pause.)
JUDGE: Sir.
THE WITNESS [Clark]: I did.
BY [DEFENSE COUNSEL]:
Q. That wasn't because you forgot it, was it?
(Pause.)
JUDGE: Answer the question, please.
THE WITNESS: That's true.
BY [DEFENSE COUNSEL]:
Q. You knew it wasn't true when you said it; isn't that right?

JUDGE: He said yes, he said that's true. [DEFENSE COUNSEL]: The answer to my question.
JUDGE: The first question, he said it was true.

12. "The testimony of an admitted or convicted perjurer should be received with caution and scrutinized with care." Criminal Jury Instructions for the District of Columbia, No. 2.24 (3d ed. 1978).

13. "The testimony of an alleged accomplice should be received with caution and scrutinized with care. ..." *Id.* No. 2.22.

clude, however, that appellant has failed to demonstrate that "prosecutorial excesses ... created substantial prejudice and thus infected the verdict." *(Duane) Dyson v. United States,* 450 A.2d 432, 443 (D.C.1982).

In his closing to the jury, defense counsel argued as follows:

> But let me point out one thing about [the prosecutor's] closing argument. Now, as you were sitting here in this case, as you heard the evidence, isn't the thing that really got your attention most caused you to think the most, well, Caniford and Joseph Johnson says the man is black. And that man over there isn't black. You heard the entire initial closing argument of [the prosecutor], and you didn't hear him say a word about those two men. Not a word. Think about that, ladies and gentlemen. Weren't you wondering about that? [The prosecutor] will be able to get up here after I leave. He will be able to talk and he will be able to argue and I won't be able to get up here again to talk about any of that. *I ask you to think about what he is saying, and think about whether it will be a clean shot, or whether it will be fair* because, ladies and gentlemen, it is a great arguing tactic to hold back an argument that is not worth anything, *until after the person who could counter it has already sat down and by the Rules of the Court, is unable to respond.* If he had the goods, wouldn't he have laid it all out?

> \* \* \* \* \* \*

> You can better believe that he will get up once I sit down and start ripping into it. *Why didn't he do it before and give me a chance to try to answer?* He would still be able to get up again and refute anything I said. No, he didn't do that. *He didn't play fair with you,* ladies and gentlemen, to let you decide. That is your job, ladies and gentlemen, to decide on the basis of the evidence, *not to play games....*

> \* \* \* \* \* \*

> [The prosecutor] is *going to rip, he is going to tear, and I am not going to be able to answer at all.* Just think about it, ladies and gentlemen. Think about whether there are good and sound reasons. *Think whether there are things I could help you work through if I would only be given a chance. But I didn't because those are things that [the prosecutor] cannot answer if he plays it fair.*

> \* \* \* \* \* \*

> [W]hen [the prosecutor] gets up and starts talking about Mr. Johnson and Mr. Caniford, *remember that I didn't ever get a chance to deal with any of those facts, and that was not by accident. That was by his choice....* [Emphasis added.]

Not to be outdone, the prosecutor on rebuttal accused the defense of misrepresentation:

> You look at the evidence. You look at what the defense has tried to do, *how they misrepresented the facts....* You remember when Donald Garrison was on the stand. [Defense counsel] was trying to cross examine him ... and *he was trying in the worst way to put words in Mr. Garrison's mouth....*

He implied that defense counsel had improperly suggested what the witnesses should say:

> [Caniford and Johnson] even had the night off to ride together to work, to ride together to Court the next day.... But they still had it all mixed up. *They had a chance to compare their statements with what they said in Court after they had a chance to talk to [defense counsel].*

*Ad hominem* attacks against opposing counsel are uncalled for and unprofessional. Defense counsel's several statements that the prosecutor had been unfair in his presentation of the evidence were inappropriate, and the prosecutor's insinuation that defense counsel had coached the witnesses went beyond the doctrine of "fair reply." *See generally (Duane) Dyson, supra,* 450 A.2d at 437–40.

We turn, accordingly, to the question whether the prosecutor's excesses resulted

in prejudice substantial enough to warrant reversal. The standard we apply is that of nonconstitutional harmless error: "whether we can say 'with fair assurance, after pondering all that has happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *(Phillip) Dyson v. United States,* 418 A.2d 127, 132 (D.C.1980) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)). The key factors are "the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." *Id.* (citations omitted).

The evidence against appellant was neither overwhelming nor flimsy. The case turned entirely on the credibility of witnesses; no physical evidence linked appellant to the crime, he made no confession, and the two main witnesses against him were admitted accomplices. Because an appellate court is not in a position to observe witnesses, on a record such as this where everything turns on credibility, we are ill-equipped to evaluate the closeness of the case. We therefore attach considerable significance to the fact that the trial court—which was in a position to evaluate the matter—denied a defense motion for a mistrial.

The prosecutor's reference to defense counsel's attempts "to twist the truth ... to twist the facts," combined with the remark quoted above insinuating that counsel somehow coached the witnesses, went to a central issue: the weight to be accorded the defense witnesses' testimony. The trial court, however, took steps to mitigate the prejudice. Instead of simply giving the standard instruction that counsel's statements are not evidence, the court cautioned the jury as follows:

> Now, you have just heard the rather heated arguments of counsel, the closing arguments. Each counsel giving his argument in his own way and during the heat of advocacy, many times counsel will give you what they believe the evidence is. They may even give you their opinions of the evidence. You are instructed herewith, that statements and arguments as you have just heard of counsel, are not evidence.

After examining the record as a whole, we are satisfied that the jury was able to follow the court's instruction and thus discount counsels' hyperbolic charges and counter-charges.

*Affirmed.*