**Reginald D. BENNETT, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 99–CF–177, 99–CF–220.**

District of Columbia Court of Appeals.

Argued Oct. 3, 2000.
Decided Nov. 22, 2000.
As Amended Feb. 7, 2001.

---

Richard K. Gilbert, Washington, DC, for appellant.

Elizabeth H. Danello, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., and Timothy J. Heaphy, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL, RUIZ, and REID, Associate Judges.

FARRELL, Associate Judge:

A jury found appellant (Bennett) guilty of possession with intent to distribute cocaine, assaulting a police officer, unlawful entry, and two counts of failure to appear for trial. His primary argument on appeal is that the trial court erroneously refused to permit him to cross-examine a key corroborative government witness, Jerome Lucas, with efforts Lucas had made to bribe or kidnap a witness in a case in which Lucas had been charged with (and ultimately pled guilty to) murder. We hold that the trial court—in part misled by representations of the prosecutor as to whether the obstructive acts had occurred—erroneously excluded the impeachment evidence. We further hold that the error was prejudicial with respect to Bennett's assault conviction, but had no substantial effect on his conviction for possession with intent to distribute. We reject as well Bennett's separate argument that the trial court erroneously refused to order correction of his pre-sentence report, and we accept the government's concession that the unlawful entry conviction must be reversed.[1] Bennett concedes the validity of his convictions for failure to appear.

## I.

On October 8, 1996, Metropolitan Police Officer Ozetta Posey and fellow officers approached an apartment building in Southeast Washington and saw four or five men standing in front smoking marijuana. While the other officers detained the men, Posey entered the building and saw Bennett standing in the lobby holding what

---

1. The government admits that the jury instructions constructively amended the charge of unlawful entry made by the indictment. *See Johnson v. United States,* 613 A.2d 1381, 1383–88 (D.C.1992). Although Bennett asks that we direct entry of an acquittal on that count, we do not go that far, because we do not find that the government adduced no evi-

dence capable of supporting a charge of unlawful entry. The error conceded by the government is that the proof presented supported a theory of unlawful entry—on which the court instructed the jury—that departed substantially from the theory charged by the indictment.

appeared to Posey to be a white ziplock bag containing multiple blue ziplock packets. According to Posey, Bennett reached into the larger bag and handed one of the ziplocks to a woman standing in front of him. Posey, who was in plain clothes, identified herself as a police officer, reached for her service weapon, and told Bennett to put his hands on the wall. Instead Bennett pushed Posey backwards, causing her to fall to the floor, and shoved a nearby bicycle on top of her before running upstairs.

At Posey's call for help another officer (Earl) entered and saw her sprawled on her back and Bennett running upstairs. The officers lost sight of him as they rushed up to the second floor. Posey first entered a vacant apartment and saw no sign of Bennett. The officers then forced open a second vacant apartment, and when Posey looked out the window of the unit she saw Bennett crouched in a fetal position on a ledge to the side of the window next to a drainpipe. At her command Bennett edged back to the window and was pulled inside. As he was being patted down, according to Posey, he blurted out that "he didn't do anything, that it was his twin brother." Bennett was carrying $327 in cash on his person.

Posey also searched the outside ledge and adjoining drainpipe and found no drugs. But when she returned downstairs and went outside, she found a ziplock bag containing smaller blue ziplocks on the ground near the drainpipe. The larger bag, which held twenty-four individual ziplocks of cocaine, appeared to Posey to be the same one she had seen Bennett holding in the lobby.

Jerome Lucas, who had been a close friend of Bennett's, also testified for the government pursuant to a plea agreement. Lucas stated that in the fall of 1996 he had seen Bennett almost every day at the building where Bennett was arrested. The police regularly came to the building, and when they did, Bennett often hid in a tenant's apartment. On one such occasion,

Lucas saw him run through the building and jump out the window of a vacant first-floor apartment. On the day of the charged events, Lucas had seen Bennett sell cocaine to several different persons in the lobby during a fifteen to twenty-five minute period. The next day, Bennett told him that an officer had come in and seen him "serving" drugs and had tried to grab him, but that he had pushed her down and run up the stairs, then tried to escape by going out on the ledge. Bennett told Lucas that the police had found "some drugs ... out there by the window" that were worth $300–$400.

## II.

Bennett contends that the trial court erroneously refused to allow him to cross-examine Lucas about his efforts to bribe and/or kidnap a witness in another case in which both Lucas and Bennett had been charged with murder. We first set forth the facts relating to the issue, then apply the governing legal principles.

### A.

On April 17, 1997, Preston Pearson was fatally shot. Lucas was stopped a short distance from the scene and charged with murdering Pearson. In March 1998, shortly before Lucas's murder trial was set to begin, the prosecutor filed a motion in limine seeking to introduce evidence of "efforts which [Lucas had] taken to prevent certain witnesses to the murder of Preston Pearson from testifying against him at trial." The motion mentioned letters and oral statements to other prisoners in which Lucas "specifically described efforts undertaken by members of his family and several of his uncharged accomplices in the charged offense to silence a female eyewitness to the murder." In another motion filed the same day, the prosecutor asked for leave to introduce prior statements by a witness who had been missing for several months, and for whose unavailability the government believed Lucas was

responsible by his efforts, at a minimum, to threaten the witness's life. The motion stated that the government had obtained information about Lucas's efforts, by himself or through others, to silence the witness.[2]

The government's proffer remained undeveloped because Lucas pled guilty in April 1998 to second-degree murder while armed. As part of his plea agreement, he cooperated with the government, and Bennett was eventually charged with participating in the murder of Pearson. Lucas testified both at the trial of the present drug and assault case in September 1998 and at Bennett's first murder trial in the summer of 1999, which ended in a mistrial. At the murder trial, Lucas testified that while he had been awaiting trial on his murder charge, he was visited in jail by his former girlfriend, Nicole Martin, and that he asked Martin if she could kidnap or bribe Tia Williams, a witness in the upcoming trial. Lucas explained that he "figured [Williams] could hurt me in a trial." Lucas also testified that while in the cellblock he had talked to another inmate, John McClam, and reached "agree[ment]" with McClam that McClam's wife would give Williams money not to come to court. Lucas was not aware whether a bribe or kidnapping had actually taken place. He admitted, significantly, that when he was debriefed by the prosecutor before he pled guilty, he told the prosecutor about his attempts to bribe or kidnap Williams.[3]

As indicated, the present trial took place well before Bennett's murder trial but after Lucas's guilty plea and debriefing by the prosecutor. Before the jury was sworn in this case, Bennett's counsel asked the court to order the government to produce evidence on which it had based its claim in the March 1998 in limine motion

that Lucas had tried to obstruct justice. The prosecutor disagreed that any information about a witness attempting to obstruct justice in an unrelated proceeding represented material the government was required to disclose under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and argued that the information instead would be "collateral to [Lucas's] credibility with regard to this defendant." *Id.* at 53–54.[4] He also stated that the factual predicate for Bennett's request was "absolutely lacking," explaining: "Certainly there was a pleading filed sometime before. I fundamentally investigated and fully came to the conclusion about whether there was a sufficient basis to charge obstruction where there were allegations made based on things that we had heard." After offering to make a proffer of the facts to the court at the bench, the prosecutor concluded: "I have never reached a conclusion that there was any witness intimidation and that is based not simply on interviewing Mr. Lucas, but on a more thorough investigation of the entire matter including the witness who was allegedly obstructed ."

The trial court, pointing out that the jury would already hear about Lucas's murder conviction and plea agreement, expressed reluctance to spend time sorting out the factual dispute over Lucas's efforts to impede testimony. The next day the court formally denied Bennett's request for disclosure of the information and permission to impeach Lucas with it. Citing *Sherer v. United States,* 470 A.2d 732 (D.C.1983), the court explained that (1) there had to be a factual predicate for the cross-examination into the attempt to obstruct justice, and (2) the proposed impeachment had to go directly to the issue

---

2. The government represents in its brief on appeal that "Williams apparently has not been seen since the fall of 1997."

3. Lucas also admitted that while in jail he had received a letter from a friend named James Green who expressed a desire to kill Williams. Lucas wrote back stating that it

was "fucked up what that bitch Tia is doing," "snitching on me."

4. The prosecutor in this case was the same one who had handled Lucas's murder prosecution.

of the veracity of the witness. The court focused on the second element and found that the alleged efforts to prevent a witness from testifying were "not the functional equivalent" of the perjury at issue in *Sherer,* but were "yet one step removed." In other words, the court did not believe that the alleged attempt to silence a witness "bears directly on the veracity of the witness for purposes of this case." A "very significant factor" for the court was that the efforts at obstruction were claimed to have occurred in another case, not this one. The court also pointed to Bennett's counsel's admission that, except for the representations in the prosecutor's in limine motion, he had no factual predicate to cross-examine Lucas about the obstruction, and to the prosecutor's representations that he had investigated further and did not believe any attempt to obstruct justice had occurred. The court therefore determined that the government had no exculpatory information to disclose.

### B.

In defending the trial court's ruling, the government makes the twofold argument that the court "properly held that the evidence [Bennett] sought could not be used to impeach Jerome Lucas," and that "[e]ven if the trial court somehow abused its discretion" in this regard, Bennett is required to and has not shown a "reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different"—in short, Bennett has not shown a *Brady* violation. As will appear later, we do not believe that the prejudice flowing from the trial court's ruling in this case is properly analyzed under *Brady*; rather, the correct standard is whether the error—and we hold that it was error—was harmless or not. We first

consider the court's conclusion that the evidence of attempts by Lucas to kidnap or bribe a witness in an unrelated case was inadmissible to impeach him.

### 1.

Lucas, of course, had not been convicted of the alleged acts of obstructing justice in his murder case.

In order to cross-examine a witness about a prior bad act that has not resulted in a criminal conviction, the examiner (1) must have a factual predicate for asking the question and (2) must show that the act "bears directly upon the veracity of the witness in respect to the issues involved [in] the trial."

*Grayton v. United States,* 745 A.2d 274, 280 (D.C.2000) (quoting *Sherer v. United States,* 470 A.2d at 738) (further citations omitted). The government makes a significant, and laudable, concession at the outset. It states in its brief:

We do not dispute on appeal that there was factual support for the claim that Lucas had tried to obstruct justice in his own case. As Lucas testified at [Bennett's] later murder trial, he had talked with Nicole Martin and John McClam about either bribing or kidnapping eyewitness Tia Williams in order to prevent her from testifying against him. Furthermore, Lucas testified that he had mentioned his efforts to silence Williams when he was first debriefed, before his guilty plea in early April 1998. We thus agree that, when the issue arose in this case in September 1998, the prosecutor should have recognized that there was a factual predicate for the proposed obstruction impeachment.[5]

The government argues, however, that "even if [Bennett] had known about Lu-

---

**5.** The government vigorously disputes Bennett's suggestion "that the prosecutor in any way acted in bad faith when he denied that such a factual predicate existed." For purposes of this appeal, we do not question its insistence that the failure to appreciate the factual significance of Lucas's conduct "re-

flected mere inadvertence rather than any sinister motive to hide evidence." We note that the prosecutor, while denying that a factual predicate existed, offered to make "more specific representation[s]" to the trial court *ex parte* in support of that position.

cas's debriefing statements, he still could not have impeached Lucas with his attempt to bribe or kidnap Tia Williams." More precisely, it argues that "[w]here, as here, the prior bad act bears no relation to the present case, the trial court does not abuse its discretion in precluding the cross-examination." As the government analyzes the proof,

> Lucas's efforts to prevent Tia Williams from testifying at his own trial did not reveal anything about his general truthfulness. Significantly, in his murder case, Lucas did not lie or even sponsor false testimony.[6] He sought to bar any testimony by the witness at all. In attempting to silence someone whom he believed to be a key witness against him, Lucas was trying to cover the trail of his crime. * * * [But these efforts, although] reflect[ing] a design to thwart prosecution[,] ... do not necessarily show an inherent tendency to lie.

We cannot agree. Lucas's admitted efforts to obstruct his trial did not merely evince consciousness of guilt, as the government submits (likening them to running from the police or hiding a murder weapon); they were an attempt to subvert a pending adjudication of guilt or innocence by a means—"silenc[ing]" a prospective witness—designed to achieve that end no less effectively than perjury or suborning perjury. Conduct of that sort, revealing a propensity or willingness to thwart the ascertainment of truth in a judicial proceeding, bears directly on the veracity of the wrongdoer in testifying at a trial.

The point was made recently by a decision interpreting Fed.R.Evid. 608(b) (impeachment with specific instances of conduct), a rule this court has looked to for guidance in applying the doctrine of *Sherer, supra. See Woodward & Lothrop v. Hillary,* 598 A.2d 1142, 1150 (D.C.1991).

In *United States v. Manske,* 186 F.3d 770 (7th Cir.1999), the defense sought to cross-examine a government witness, Pszeniczka, about past acts of witness intimidation which the government acknowledged had taken place.[7] The trial court barred the impeachment. On appeal, the government "essentially urge[d] on" the court a "narrow reading" of Rule 608(b) whereby a crime is viewed "as bearing on veracity only if it involves falsehood or deception, such as forgery or perjury." *Id.* at 775. The court of appeals rejected that reading. It quoted with approval a treatise on evidence which recommended that "[w]hen [a party's question is] specific and well-founded, the cross-examiner should be allowed to ask ... questions on acts better described as dishonest than false ... [including questions related to] *concealing or frightening off witnesses* or suborning perjury (even in unrelated cases)." *Id.* (emphasis by court), quoting C. MUELLER & L. KIRKPATRICK, FEDERAL EVIDENCE, 160–61 (2d ed.1994). The court also pointed to its prior decisions extending the reach of the rule to acts of theft and receiving stolen property, and reasoned:

> [T]he relationship between the specific acts of misconduct and truthfulness is, if anything, more compelling in this case. Threatening to cause physical harm to a person who proposes to testify against you is at least as probative of truthfulness as receiving stolen tires or a stolen railroad ticket. Also, because Stephen Pszeniczka had no compunction about intimidating potential witnesses in previous legal proceedings, "it is hard to see" why he would hesitate to obtain an advantage for himself in [the defendant] Manske's trial by giving false testimony against Manske.

---

6. We delete the government's footnote at this point and add our own, noting that Lucas's guilty plea did away with the need for testimony at a trial.

7. These were "incidents where Pszeniczka, or people acting on his behalf, allegedly threatened potential witnesses in an effort to keep them from incriminating him." 186 F.3d at 773.

*Id.* at 776. The advantage Pszeniczka "hoped to obtain, it appears, was leniency from the government in return for his testimony." 186 F.3d at 776. At trial in this case, Lucas too admitted that sentencing on his guilty plea to murder had been put off to give him an opportunity to cooperate with the prosecutor.

██ The government emphasizes that under our decision in *Sherer* the bad act must "bear[ ] *directly*" (emphasis added) upon the veracity of the witness, arguing that the adverb gives the trial court more latitude to exclude such acts as insufficiently relevant than perhaps a federal judge has in applying Rule 608(b). *See Hillary,* 598 A.2d at 1150 n. 11 (expressly not implying "identity in all respects between that rule and the rule stated in *Sherer*"). But even assuming that is true of acts reflecting dishonesty in a broader sense, for example, theft or receiving stolen property, we have no difficulty holding that acts such as suborning perjury or bribing or kidnapping witnesses bear "directly" on the credibility of a witness for impeachment purposes.

Additional confirmation of this view is furnished by Fed.R.Evid. 609 (impeachment with prior convictions), specifically the distinction which that rule makes between crimes "involving dishonesty or false statement" and all other felonies. Admission of the former class of convictions to impeach is mandatory, Rule 609(a)(2), reflecting Congress's understanding of those crimes as "in the nature of crimen falsi, the commission of which involves some element of deceit, untruthfulness, or falsification bearing on the accused's propensity to testify truthfully."[8] In *United States v. Smith,* 179 U.S.App. D.C. 162, 551 F.2d 348 (1976), the court (per Judge McGowan) explored the meaning of "crimen falsi" at common law and found that it "encom-

passed ... those crimes characterized by an element of deceit or *deliberate interference with a court's ascertainment of truth." Id.* at 177, 551 F.2d at 363 (emphasis added). Included within the class "were perjury, subornation of perjury, suppression of testimony by bribery, [and] conspiracy to procure the absence of a witness." For the "distinguishing characteristic of crimes listed under the *crimen falsi* rubric," Judge McGowan concluded, "was their close relationship to the judicial process." *Id.* at 176–77 n. 26, 551 F.2d at 362–63 n. 26.

██ As evidence of "deliberate interference with [the] ascertainment of truth" at his impending murder trial, Lucas's efforts to bribe or kidnap a witness were a proper subject of cross-examination in this case. Although the government reminds us that the trial court enjoys broad discretion in deciding whether to allow cross-examination into instances of bad conduct by a witness, *Roundtree v. United States,* 581 A.2d 315, 323 (D.C.1990), "[t]he usual deference does not apply when a [trial] court incorrectly recognizes the nature of the evidence." *Manske,* 186 F.3d at 776; *see Johnson v. United States,* 398 A.2d 354, 365–66 (D.C.1979). Given the direct bearing that Lucas's prior acts had on his veracity as a witness, the trial court erred in excluding the impeachment.

**2.**

██ As explained earlier, the government contends that even if the court erred (or "abused its discretion") in ruling that evidence of Lucas's attempts to obstruct justice was inadmissible, the issue ultimately comes down to whether the prosecutor's failure to disclosure Lucas's now-conceded efforts to silence a witness violated *Brady v. Maryland.* Under that standard, reversal is warranted only if the

---

**8.** H.R. Conf. Rep. No. 93–1597, at 9, *reprinted in* 1974 U.S.Code Cong. & Admin.News pp. 7098, 7103.

disputed evidence is "material" in the sense defined by the Supreme Court, namely whether, had it been disclosed to the defense, there is "a reasonable probability that ... the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).[9]

■ However, we do not believe that *Brady* furnishes the correct standard for evaluating prejudice to the defense in this case, because it is not a case of suppression of evidence by the government. Rather, that evidence in question was substantially in Bennett's possession, and only the trial court's erroneous ruling prevented it from being used. The government's in limine motion in Lucas's murder case— a public document—asserted that Lucas had made "efforts ... to prevent certain witnesses to the murder of Preston Pearson from testifying against him at trial," through actions by "members of his family and several of his uncharged accomplices in the charged offense to silence a female eyewitness to the murder." So strong was the government's belief that Lucas had procured the witness's absence that it sought—again publicly—the admission of statements by the witness at Lucas's trial over any objection on grounds of confrontation. All Bennett asked for in his oral *Brady* motion was the "precise evidence" that caused the government to make those representations. It is not apparent to us why the information Bennett already had, for which the government had vouched in the pleadings, was not enough of a factual basis for the court to permit questioning of Lucas about particular efforts he had made to silence a female eyewitness or others to the murder. Bennett would not

have been entitled to prove the prior acts by extrinsic evidence, for the *Sherer* doctrine bars that course. *Sherer*, 470 A.2d at 738. Nor would Lucas reasonably have been expected to deny such efforts categorically, or else—given his admitted statements to the prosecutor—the government would have had substantial difficulty in sponsoring his testimony. *See Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

■ We therefore conclude that the *Brady* standard does not control the issue before us, which is whether Bennett was prejudiced by the court's erroneous exclusion of the impeachment evidence. In answering that question, we apply the customary harmless error standard under which "the reviewing [court] must set aside the verdict and judgment unless [its] 'conviction is sure that the error did not influence the jury, or had but very slight effect.'" *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (quoting *Kotteakos v. United States*, 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).[10] Stated affirmatively, the question is whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos*, 328 U.S. at 776, 66 S.Ct. 1239.

The government maintains, first of all, that an admission by Lucas that he had sought to bribe or kidnap Tia Williams could have only had slight effect beyond the reasons the jury already had to question his veracity, given his conviction for murder and the significant sentencing concessions he had received for his testimony in this case. Yet the jury also knew that the government was implicitly vouching for

---

9. Moreover, the burden is on the defendant to prove materiality—hence prejudice—in the *Brady* sense. *See, e.g., Strickler v. Greene*, 527 U.S. 263, 291, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *Brooks v. United States*, 396 A.2d 200, 204 n. 10 (D.C.1978).

10. An erroneous ruling on admissibility under *Sherer* does not, without more, trigger constitutional harmless-error analysis under *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), a point Bennett conceded at oral argument. *Cf. Roundtree*, 581 A.2d at 329 n. 34.

his testimony because, as the prosecutor made certain the jury knew, the plea agreement was contingent on Lucas's giving truthful evidence at trial. There is sound practical sense in Bennett's counsel's argument that in such circumstances the jury naturally looks for additional indication of a witness's propensity to conceal the truth, strongly available here in the form of Lucas's willingness to kidnap and bribe witnesses.[11] Therefore, we have no reasonable assurance that the excluded impeachment would have had negligible effect on the government's case, unless Lucas's testimony was relatively unimportant to it. We turn to that issue.

■ Looking first at the charge of assaulting a police officer, Bennett's defense—through cross-examination and argument to the jury—was that he shoved Officer Posey in self-defense when, dressed in plain-clothes and without identifying herself, the officer reached for her gun, causing him to fear that she was intent on robbing him of the $327 in his pocket. Although Posey testified that she had announced her identity ("Metropolitan Police Department!") before drawing her weapon and ordering him to put his hands against the wall, no one else testified about the altercation. Lucas's subsequent testimony undermined the defense in three ways. He stated that he was outside the building when a car pulled up and people *he* recognized as police jumped out wearing "little arm bands ... with the Metropolitan Police sign." He also recounted earlier occasions when the "jump out"

team would arrive at the same building in similar fashion and Bennett would hide in a tenant's apartment, once jumping out of a window to escape them. The implication was that he knew police when he saw them. Finally, Bennett confessed to Lucas the day after his arrest that an "*officer* [had come in] and seen him serving somebody [cocaine] and she tried to grab him and he pushed her down and ran up the steps" (emphasis added). If believed, Lucas's testimony left Bennett's defense to the assault charge in tatters.

To be sure, Posey herself described the altercation in detail, was not shown to have any motive to accuse Bennett falsely, and was impeached only modestly with discrepancies between her trial and grand jury testimony.[12] As the prosecutor told the jury, even without Lucas's testimony "[y]ou still have more than sufficient evidence ... based just on what [Officer Posey] told you." But the *Kotteakos* standard is not met that easily, unless the "more" in the evidence was enough reasonably either to cause the jury to discount Lucas's testimony altogether, or to cause a hypothetical jury to credit it even knowing the worst about his veracity. We are not convinced that either was the case. We therefore must reverse Bennett's conviction for assault and remand that count for a new trial.

■ We reach a different conclusion on the count of possession with intent to distribute. Posey saw Bennett hand a ziplock bag to a woman from a larger bag containing blue ziplocks. She and her partner, Officer Earl, then both saw him run upstairs to the second floor where he was quickly found crouched on a ledge outside

---

11. The government further points to Lucas's admissions on the stand that (a) he had lied to a defense investigator (at Bennett's insistence) and (b) would have perjured himself in court to protect his friend Bennett *but for* the need to fulfill his side of the plea agreement. Each of these admissions too, however, is consistent with the government's implied sponsorship of his testimony as truthful.

12. In contrast to her grand jury testimony stating that she had seen Bennett enter the upstairs apartment, go out the window, and shimmy across the ledge, she explained at trial that she had simply "assumed" he had done these things from hearing the door to the apartment kicked in, seeing a window in the room open, and finding him on the ledge.

an apartment window. On the ground below him was an open bag that "appeared [to Posey] ... to be the same white sandwich" bag with blue ziplocks she had seen in his hand. Earl had searched the outside area before Bennett's flight and seen no drugs.[13] When Bennett was pulled back inside the window, he promptly stated that "he didn't do anything, that it was his twin brother." In his pocket was $327 in cash. The jury further found that Bennett had twice willfully failed to appear for trial, again revealing—so the prosecutor argued to it—Bennett's consciousness of guilt.

Against this background Lucas's testimony fades to relative insignificance. He too purportedly had seen Bennett selling cocaine in the lobby before the police arrived; and Bennett told him the next day of the chase up the stairs and the police' recovery of $300–$400 in drugs "on the ledge" he had jumped onto. But Lucas added no essential detail to the events described by Posey and Earl, neither of whom was shown to have a motive to embellish the proof of Bennett's possession.[14] The confirmation he provided was incremental, no more. What convicted Bennett on the drug charge, we are confident, was the testimony of Posey and Earl together with the inherent implausibility of any innocent explanation for his being caught out on the ledge with the drugs on the ground below him. Put differently, we can think of no reason why the jury would have questioned the reliability of Bennett's admissions to Lucas, strongly corroborated

as they were, even if it had known the worst about Lucas's veracity.

The erroneous limitation on Bennett's ability to impeach Lucas had no substantial effect on the verdict of drug possession. *Kotteakos, supra.*

### III.

Bennett's remaining contention is that the trial court erroneously refused to resolve a dispute over the accuracy of statements in his presentence investigation report about past criminal charges against him. He concedes that the court in sentencing him disavowed any reliance on the alleged inaccurate representations, but argues that the inaccuracies, unless corrected, may affect his parole eligibility.

At the outset, we do not agree with Bennett's assertion that the court "accepted" as true his claims of inaccuracy in the report. Rather, the court referred to the information "that *you* [defense counsel] say is inaccurate" (emphasis added), in disclaiming reliance on it. The court was "[un]willing to have litigation" over alleged inaccuracies that it did not regard as material to the sentence it intended to impose. Thus, Bennett's case does not present what he views as the narrow issue of whether sentencing judges should be required (under this court's "supervisory power") to order correction of "accepted" or conceded errors in presentence reports. Applied to his situation, the rule he urges would be that the judge must resolve *disputes* at sentencing over the accuracy of information in the report even though the

---

13. Bennett points to Earl's testimony that other persons were smoking marijuana in front of the building when the police arrived, arguing that the jury, but for Lucas's unimpeached testimony, might have been receptive to his argument that one of the smokers dropped the bag of cocaine. But Earl testified that he had "frisked" the smokers and ordered them all to leave ("I told them not to come back"). After then rushing inside to aid Posey, he came outside again and saw that they were gone. Reasonable jurors would wonder what

incentive any of the smokers had to abandon cocaine (almost at Bennett's feet) once the police had turned their attention away from them.

14. Had the officers been intent on doing that, as the prosecutor suggested to the jury, it would have been more useful to them to situate the recovered drugs on the ledge itself rather than on the ground one story below Bennett.

judge does not intend to rely on that information.[15]

 We reject such a rule. As Bennett concedes, Fed.R.Crim.P. 32(c)(1) allows the sentencing judge to forgo resolving controverted matters in the presentence report after "determin[ing] that no [such] finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing." Without any indication that Super.Ct.Crim.R. 32 requires more, we decline to impose an unnecessary and onerous obligation on the trial court. As the judge here recognized (by agreeing to attach Bennett's written claims of inaccuracy to the presentence report), Bennett's recourse is to the Federal Bureau of Prisons and the United States Parole Commission.[16]

Bureau of Prisons regulations specifically allow an inmate to challenge information in his or her "central file," which includes the presentence investigation report. Federal Bureau of Prisons Program Statement No. 5800.11, §§ 8(g)(1)(d) and 15(c) (Sept. 8, 1997). The Bureau is required to take "reasonable steps to ensure the accuracy of the challenged information, particularly when that information is capable of being verified." Id. § 15(c). The regulations give as an example an inmate challenge to information in the presentence investigation report, and spell out the procedural steps that the staff must follow in response. Id. If after consulting with the probation authorities who wrote the report, the Bureau learns that the challenged information is not accurate, it must file the new information in the inmate's central file, make a notation "to ensure that future decisions affecting the inmate

are not based on the discredited information," and review and correct any reports that were made based on the inaccurate information. Id.

Parole Commission regulations also both anticipate that inmates will challenge factual inaccuracies in their presentence reports and require those challenges to be resolved. See 28 C.F.R. § 2.74(c) (with respect to District of Columbia inmates, "[r]elevant issues of fact shall be resolved by the Commission in accordance with § 2.19(c) of this part"); 28 C.F.R. § 2.19(c) ("If the prisoner disputes the accuracy of the information presented, the Commission shall resolve such dispute by the preponderance of the evidence standard; that is, the Commission shall rely upon such information only to the extent that it represents the explanation of the facts that best accords with reason and probability"). Indeed, both the Parole Commission and the Bureau of Prisons can be held liable for money damages if they do not act to correct disputed information in a prisoner's files. Sellers v. Bureau of Prisons, 294 U.S.App. D.C. 361, 366, 959 F.2d 307, 312 (1992) (under federal Privacy Act, agencies "must take reasonable steps to maintain the accuracy of the information to assure fairness to the individual").

In light of these available remedies, and the trial court's disavowal of reliance on the alleged inaccuracies in Bennett's presentence report, the court did not abuse its discretion in imposing sentence without resolving whether there were such inaccuracies.

### IV.

To summarize, we reverse Bennett's convictions for assault on a police officer

15. Bennett does not contend that the prosecution agreed with his claim of inaccuracies in the presentence report. In a different case, where both the defense and the government recognized that the report contained an inaccuracy, we see no reason why the sentencing judge could not order the report to be corrected.

16. Under the National Capital Revitalization and Self Government Improvement Act of 1997, Pub.L. No. 105–33, 111 Stat. 712 (1997), District of Columbia Prisoners such as Bennett will soon be housed, if they are not already, in a federal correctional institution under the control of the Federal Bureau of Prisons, where they will be subject to the same regulations as federal prisoners. See id. § 11201(b).

and unlawful entry; we affirm the convictions for possession with intent to distribute cocaine and failure to appear.

*So ordered.*